CITIZENS' ACCEPTANCE CORPORATION, a dissolved corporation continued by Statute for purposes of suit, et al.

v.

UNITED STATES of America, Appellant.

No. 71–1518.

United States Court of Appeals, Third Circuit.

Argued April 11, 1972.

Decided June 19, 1972.

William Goldman, Meyer Rothwacks, Dept. of Justice, Tax Div., Washington, D. C., Fred B. Ugast, Acting Asst. Atty. Gen., Harry Baum, Atty., Tax Div., Dept. of Justice, Washington, D. C., for appellant; F. L. Peter Stone, U. S. Atty., of counsel.

Robert W. Tunnell, Tunnell & Raysor, Georgetown, Del., for appellees.

Before HASTIE, VAN DUSEN and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

Citizens' Acceptance Corporation ("Citizens") brought suit against the United States for a federal income tax refund. After submission of a stipulation of facts to the district court, both Citizens and the United States filed motions for summary judgment. The United States has appealed from the district court order denying its motion for summary judgment and granting that filed by Citizens. See Citizens' Acceptance Corporation v. United States, 320 F. Supp. 798 (D.Del.1971).

The transaction giving rise to Citizens' refund suit was a sale by Citizens of its instalment loan receivables to Wilmington Trust Company ("Wilmington") pursuant to a plan of liquidation conforming to the requirements of Section 337 of the Internal Revenue Code. The specific question raised by this appeal is whether Citizens was required under the tax benefit rule to include in income in the year of sale the entire $164,311. contained in its bad debt reserve maintained for these receivables, or only the $64,777. that Citizens contends was the only amount "recovered" in the sale to Wilmington. The district court agreed with Citizens that only $64,777. of the bad debt reserve was recovered and ordered that the United States issue to Citizens a tax refund of $27,583.81, plus interest. For the reasons to be stated, we reverse the judgment of the district court and remand, with directions to grant the summary judgment motion filed by the United States and deny such motion filed by Citizens.

### I.

Prior to November 1, 1963, Citizens conducted a general finance business from its home office in Delaware and

from branch offices located in Delaware and Maryland. Its business consisted primarily of purchasing notes receivable and instalment obligations from retailers, of making direct loans, and of financing dealers' inventories. Citizens used an accrual method of accounting for these receivables. When a receivable was acquired. Citizens entered its full face value on its books as an asset, including both the principal amount to be repaid and the total unearned finance charges to be received over the term of the receivable. The amount of the unearned finance charges would then be credited to a liability account and as the unearned finance charges became earned (presumably through the passage of time), the amounts so earned were credited to an income account and debited against this liability account.

Citizens provided for bad debt losses with respect to these receivables by means of a reserve method of accounting. Thus, at the end of each tax year, Citizens adjusted a "reserve for bad debts" contra-asset account so that it would equal the amount of receivables which were anticipated to become worthless in future years. Any addition to the bad debt reserve found necessary would then be debited to a "bad debt expense" account and deducted from gross income for federal income tax purposes.[1] When a particular receivable actually became uncollectible as a bad debt, the "reserve for bad debts" account and the "unearned finance charges" account would be debited and the receivable asset account credited in appropriate amounts. Thus, the amount in Citizens' reserve for bad debts at any particular time represented the amount of bad debt losses which Citizens had deducted from gross income in the past for income tax purposes but which had not yet actually occurred.

On November 1, 1963, pursuant to a plan of complete liquidation, Citizens sold substantially all of its assets, including its receivables, to Wilmington. As consideration for these receivables, which at the time of the sale had an aggregate outstanding face value of $5,078,284., including $700,610. in unearned finance charges, Citizens received $4,648,523. from Wilmington. The contract of sale indicates that this sale price was arrived at by subtracting from the $5,078,284. aggregate outstanding face value of the receivables (1) an allowance for bad debts equal to 1.96 per cent. of this aggregate, or $99,534., and (2) an artificially determined amount of "unearned finance charges" amounting to $330,227.[2]

The liquidation of Citizens' assets was carried out in accordance with the requirements of Section 337 of the Internal Revenue Code, which provides that when a corporation distributes all of its assets within a year, pursuant to a plan of complete liquidation, "no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period." 26 U.S.C. § 337(a).[3] Thus, when Citizens

---

1. This reserve method of providing for bad debt losses is permitted under the terms of Section 166(c) of the Code, 26 U.S.C. § 166(c).

2. Analysis of the "unearned finance charges" calculation reveals that it was designed to produce a purchase price which, given both a regular pattern of receivable income and a four per cent. annual add-on return, would produce the total face value of the receivables (including unearned finance charges) at the time of sale (less a bad debt allowance of $99,534.). In other words, Wilmington agreed to pay a price for Citizens'

receivables which would provide a projected return on its investment of four per cent. add-on, assuming that bad debt losses would be equal to $99,534. The extent to which the actual anticipated return on these receivables exceeded this four per cent. annual add-on rate, therefore, inured to the benefit of Citizens in the form of profit on their investment in the receivables.

3. In October 1963, the Internal Revenue Service sent Citizens a letter ruling, stating, in part, as follows:
    "The transaction contemplated by the agreement between Wilmington . . .

filed its federal income tax return for the year ending March 31, 1964, it reported a non-recognizable gain of $270,849., equal to the difference between the amount received for the receivables ($4,648,523.) and the cost basis of the receivables without adjustment for former bad debt deductions ($4,377,674.).[4] However, Citizens also restored the entire amount in its reserve for bad debts account at the time of sale ($164,311.) to income and paid an income tax based upon this full amount.[5] At issue on this appeal is whether Citizens was required to make this full restoration under the circumstances involved.

## II.

On March 3, 1967, Citizens filed a claim for a federal income tax refund, claiming that it was not required to restore to income the $99,534. allowed for bad debts in the contract of sale with Wilmington, because this amount should have been charged against Citizens' bad debt reserve. The Internal Revenue Service disagreed and Citizens then instituted a timely action for a refund in the district court pursuant to 28 U.S.C. § 1346.

In its suit filed in the district court, Citizens abandoned its original theory and argued instead that the $99,534. in its bad debt reserve was "transferred" to Wilmington at the time of sale and was, therefore, not properly included in Citizens' income for the year, relying on the recent decision of the Supreme Court in Nash v. United States, 398 U.S. 1, 90

S.Ct. 1550, 26 L.Ed.2d 1 (1970). In Nash the Court held that when eight partnerships transferred their assets to eight newly formed corporations in exchange for shares in the corporations—transfers that produced no gain or loss under § 351 of the Internal Revenue Code—there was no "recovery" of the bad debt reserves under the tax benefit rule "[s]ince the reserve for purposes of this case was deemed to be reasonable and the value of the stock received upon the transfer was equal to the *net value* of the receivables . . . ." 398 U.S., at 4, 90 S.Ct., at 1552 (emphasis in original). After a review of the policies underlying Sections 337 and 351 of the Code, as well as cases construing them, the district court held (1) that the principle applied in Nash to a § 351 transaction should also apply to the sale of Citizens' receivables to Wilmington pursuant to § 337, and (2) that consistent with this principle, a taxpayer should be deemed to have "recovered" the amount in a debt reserve at the time of sale only to the extent that he receives consideration in excess of the "net value" of the receivables.

The district court found that the "net value" of the receivables was equal to their adjusted face value (i. e., face value less unearned finance charges) of $4,377,674. less the bad debt reserve of $164,311., or $4,213,363. The district court also found that the consideration received by Citizens for the receivables was $4,278,140., which it calculated by subtracting the contractual allowance for

Citizens' and Realty covering real estate, office equipment, automobiles, *instalment loan receivables, wholesale loan receivables and miscellaneous receivables* will constitute sales of property as defined by Section 337(b) of the Code. . . . [N]o gain will be recognized, in each instance, to Citizens' . . . from such sales in accordance with section 337(a) of the Code. . . . *This ruling is inapplicable to the items of the nature described in Revenue Ruling 61–214, C.B. 1961–2, 60, from which Citizens . . .*

*derived full tax benefit through deductions in prior years, and the portion of the proceeds allocable to such items, if any, will be treated as ordinary income.* (48a) (Emphasis added.)

4. The parties have stipulated that Citizens' "tax basis" (see Section 1011 of the Code, 26 U.S.C. § 1011) in the receivables was $4,377,674. ($5,078,284 less $700,610.).

5. See note 7, *infra.*

possible bad debt losses of $99,534.[6] from the adjusted face value of $4,377,674. Applying these figures to the "recovery" formula which it deduced from the *Nash* opinion, the district court determined that Citizens had "recovered" only $64,-777. of the $164,311. bad debt reserve. Since Citizens had paid a tax based upon an income recovery of the full amount of the bad debt reserve, the district court ordered that the United States refund the difference between the tax that Citizens actually paid and the tax based upon an income recovery of only $64,777. of the bad debt reserve, plus interest.[7]

## III.

On the record before the district court, we have concluded that its finding that Citizens received $4,278,140. for the receivables sold to Wilmington is clearly erroneous. The parties themselves stipulated that the "consideration received by . . . Citizens . . . with regard to the installment receivables sold to Wilmington . . . was $4,648,523.00," [8] and this is the amount that Citizens stated as its consideration for the receivables sold to Wilmington in both its income tax return [9] and its claim for refund.[10] The apparent decision of

---

6. The following first part of Exhibit F to the Stipulation, as well as paragraph 3(b) (iii) of the agreement of sale, makes clear that this figure was determined as a percentage of balances existing on October 31, 1963, solely as a valuation for purposes of sale and with no relation to actual bad debt losses of Citizens:

### "CITIZENS' ACCEPTANCE CORPORATION
Valuation of Installment Receivables for Purposes of Sale to Wilmington Trust Company, as of October 31, 1963

| | | |
|---|---|---|
| 1. Aggregate outstanding balances, October 31, 1963 | | $5,078,284 |
| 2. Less: (a) Unearned finance charges as calculated on the basis of a 4% add-on return (see computation below) | $330,227 | |
| (b) Allowance for possible losses on bad debts (1.96% of item no. 1) | 99,534 | 429,761 |
| 3. Adjusted value for purposes of sale | | $4,648,523" |

---

Paragraph 16 of the Stipulation provides:
"16. Attached hereto as 'Exhibit F' is a computation which reflects the formula by which the selling price of the installment accounts receivable was determined. A factor of 1.96%, the national average for bad debt losses suffered by finance companies as reported by the First National Bank of Chicago, was applied against the face amount on the installments accounts receivable, namely the sum of $5,-078,284.10, which amounted to the sum of $99,534.00. This figure was selected, as the percent of bad debt losses fluctuated in Citizens' Acceptance Corporation prior years to such a degree as to be useless in determining a bad debt loss figure for purposes of sale."
See page 3 above, including note 2.

7. In the taxable year involved in this suit, Citizens reported a taxable income of only $81,342.49 (after including the $164,311. bad debt reserve in gross income) and a tax liability of $36,000.14. Subsequently the Internal Revenue Service allowed an $8,416.33 tax refund based upon a carry back of a net operating loss which Citizens sustained for a short taxable period ending September 30, 1964. The result is that if Citizens is correct in its contention that it was not required to include in income $99,534. of its bad debt reserve, it would be entitled to a refund of the balance of its tax payments for this year, or $27,583.81.

8. Paragraph 17 of the Stipulation at 13a.

9. See 79a.

10. See 86a.

the district court to allocate the purchase price of $4,648,523. between the principal due on the receivables and the unearned finance charges was incorrect. *See* Margolis v. C. I. R., 337 F.2d 1001, 1008–1009 (9th Cir.), modified, 339 F.2d 537 (9 Cir., 1964). Thus, we hold that Citizens received $4,648,523. for the receivables sold to Wilmington on November 1, 1963.

■ As indicated above, the sale of the receivables to Wilmington was carried out by Citizens pursuant to the terms of Section 337 of the Internal Revenue Code, 26 U.S.C. § 337, under which "no gain or loss" is recognized from the qualified sale of property within a 12-month period. This language, on its face, might be taken to mean that the recovery of amounts which had already been deducted as expenses in prior years need not be recognized in a Section 337 liquidation. This position, however, has recently been rejected by this court in Connery v. United States, 460 F.2d 1130 (3d Cir., 1972), in which this court stated that "tax benefit principles apply to a § 337 transaction."

■■ We hold that, on this record, the entire amount of the bad debt reserve maintained by Citizens in connection with the receivables sold to Wilmington was recovered by Citizens under tax benefit p.. .iciples. The tax benefit rule requires "that a recovery of an item that has produced an income tax benefit in a prior year is to be added to income in the year of recovery." Nash v. United States, 398 U.S. 1, 3, 90 S.Ct. 1550, 1551, 26 L.Ed.2d 1 (1968).[11] In the instant case Citizens does not deny that the entire $164,311. in its bad debt reserve had been deducted as bad debt expenses in prior years, which deduc-

tions resulted in tax benefits to Citizens in the years in which the additions to the reserve were made.[12] Citizens concedes that it has "recovered" $64,777. of its bad debt reserve, representing the difference between the $164,311. in the reserve at the time of the sale of the receivables to Wilmington and the $99,534. allowance for possible bad debts contained in the contract of sale.[13] Citizens argues, however, that it did not "recover" the remaining $99,534. since this amount was deducted from the purchase price received by Citizens for the receivables. Citizens argues that because the selling price of the receivables was reduced by the $99,534. allowance for future bad debt losses on the receivables, Citizens cannot be said to have benefited from this portion of its bad debt reserve.

■ Citizens' argument ignores the purpose of the bad debt deduction and the realities of the sale of Citizens' receivables to Wilmington. We agree with the Government's contention that the purpose of a bad debt deduction, including that taken pursuant to a reserve method of accounting, is to account for (1) the taxpayer's unrecovered cost or capital investment, and (2) amounts reported as income but ultimately not collected because they became worthless. See Investors Discount Corp. v. Commissioner of Internal Revenue, 48 T.C. 767, 771 fn. 6 (1967), and authorities cited; Treasury Regulation § 1.166–1, 26 C.F.R. § 1.166–1. In the instant case Citizens has admitted that the receivables which it sold to Wilmington had a cost basis of no more than $4,377,674.[14] Since Citizens had previously deducted bad debt losses of $164,311. (the amount in its bad debt reserve at the time of sale), Citizens' unrecovered investment in the

---

11. See, *e. g.*, Spitalny v. United States, 430 F.2d 195 (9th Cir. 1970) ; 1 J. Mertens, The Law of Federal Income Taxation § 7.34 at 103–04 (1969) (footnotes omitted) :

"The general rule, not expressly stated in the Code but developed through the case law, is that, if an amount deducted from gross income in

one taxable year is recovered in a later year, the recovery is income in the later year."

12. See Sections 111(a) and (b) (4) of the Internal Revenue Code, 26 U.S.C. § 111 (a) and (b) (4).

13. See appellee's brief at 11–12.

14. See note 4, *supra*.

receivables was $4,213,363. In its sale of these receivables to Wilmington, Citizens received $4,648,523., or $435,260. more than its unrecovered investment. Thus, after the sale of the receivables, it was clear that Citizens did not and would not in the future sustain any part of the $164,311. loss to its investment which was anticipated by its reserve for bad debts. In these circumstances, we hold that Citizens has recovered the entire amount in its bad debt reserve. See West Seattle Nat'l Bank of Seattle v. C. I. R., 288 F.2d 47 (9th Cir. 1961); Handleman v. Commissioner of Internal Revenue, 36 T.C. 560 (1961); Note, 76 Harv.L.Rev. 780, 795–98 (1963); cf. Estate of Schmidt v. C. I. R., 355 F.2d 111, 113 (9th Cir. 1966).

This result is entirely consistent with the decision of the Court in Nash v. United States, 398 U.S. 1, 90 S.Ct. 1550, 26 L.Ed.2d 1 (1970). In Nash the Court held that there was no recovery of the bad debt reserve when assets of a partnership, including the accounts receivable, were transferred to a corporation in exchange for shares in the corporation. The Court reasoned that "[a]ll that petitioners received from the corporations were securities equal in value to the net worth of the amounts transferred, that is the face value less the amount of the reserve for bad debts." 398 U.S. at 4, 90 S.Ct. at 1551. Since all the infirmities in the accounts receivable which justified the bad debt reserve were carried over to these accounts in the hands of the corporation, the stock which the taxpayers received in exchange for these receivables reflected all these infirmities. See 398 U.S. at 5 and n. 5, 90 S.Ct. 1550. In the instant case, however, Citizens has received $4,648,523. for its receivables, an amount which is $435,260. more than what Citizens itself concedes to be their net value.[15] Furthermore, this cash consideration is not at all affected by the actual infirmities in the receivables in the hands of Wilmington, so that, unlike the taxpayers in Nash, Citizens will not be affected as

bad debt losses anticipated by the bad debt reserve actually occur.

For the foregoing reasons, the judgment of the district court will be reversed and the case remanded for the entry of judgment in favor of the United States, as described above at page 2.

---

15. See appellee's brief at 11.