CENTRALIA FEDERAL SAVINGS AND LOAN ASSOCIATION,
PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

EVERGREEN FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION,
PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket Nos. 1685-74, 1686-74.    Filed June 28, 1976.

*William H. Kinsey,* for the petitioners.
*Leo A. Reinikka, Jr.,* for the respondent.

HALL, *Judge:* Respondent determined deficiencies in petitioners' income taxes in the amounts and for the years as follows:

| Petitioner | Year | Deficiency |
|---|---|---|
| Centralia Federal Savings & Loan Association_____ | 1969 | $71,011.26 |
| | 1970 | 47,023.66 |
| | 1971 | 70,213.52 |
| Evergreen First Federal Savings & Loan Association __ | 1969 | 52,619.41 |
| | 1970 | 41,115.65 |
| | 1971 | 38,352.30 |

These cases were consolidated for trial, briefing, and opinion.

The principal issue in these cases is whether the federal insurance reserve and the reserve for contingencies as maintained by each of the petitioners constitute reserves for bad debts within the requirements of section 593 [1] and the regulations thereunder.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Centralia Federal Savings & Loan Association (Centralia) and Evergreen First Federal Savings & Loan Association (Evergreen) are domestic building and loan associations within the meaning of section 593. Centralia's principal place of business when it filed its petition was Centralia, Wash. Evergreen's principal place of business when it filed its petition was Chehalis, Wash.

Petitioners filed their Federal corporate income tax returns for the years in issue with the Internal Revenue Service Center in Ogden, Utah. These returns were kept as part of the petitioners' permanent records and books of account. Petitioners reported their income on the calendar year basis, used the accrual method of accounting, and employed the reserve method for bad debts. By reference to petitioners' records, it was possible to reconstruct their reserves for losses on qualifying real property loans as they should have been maintained. However, no single ledger card or subsidiary ledger account was maintained by means of which the correct balance in such accounts could be seen at a glance.

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the years in issue.

On their returns for the years in issue the petitioners claimed the following bad debt deductions:

| Petitioner | Year | Bad debt deduction |
|---|---|---|
| Centralia_____ | 1969 | $134,491.00 |
| | 1970 | 103,994.46 |
| | 1971 | 160,957.13 |
| Evergreen _____ | 1969 | 99,658.00 |
| | 1970 | 90,167.81 |
| | 1971 | 84,852.89 |

These claimed bad debt deductions were disallowed in full. Respondent does not question the mathematical computation of the claimed bad debt deductions as a percentage of income under section 593(b)(2). The computations of the petitioners' bad debt deductions are clearly set forth on their tax returns for the years in issue.

Petitioners' deposits are insured by the Federal Savings & Loan Insurance Corp., and petitioners are subject to the regulatory powers of the Federal Home Loan Bank Board. Under applicable regulations, petitioners are required to maintain an adequate "Federal Insurance Reserve" to protect the interests of depositors related to losses generally, including (but not confined to) bad debt losses. The federal insurance reserve was a sum determined as a function of the percentage of income in certain accounts and the volume of qualified loans.

Petitioners maintained general ledger reserve accounts as follows: (1) Federal insurance reserve, and (2) reserve for contingencies. Commencing prior to the years in issue, the reserve for contingencies has been considered by petitioners as part of their federal insurance reserve. The amount added annually to the reserve for contingencies represented the excess of the estimated bad debt deduction for the year over the amount added to the federal insurance reserve proper. Thus the sum of the two annual additions represented the estimated bad debt deduction. The two reserves combined were intended by both petitioners to constitute their statutory bad debt reserve for qualifying real property loans as to the years in issue. Aggregate additions to the general ledger federal insurance reserve account and to the general ledger reserve for contingencies account were made by petitioners as follows:

| Petitioner | Year | Additions |
|---|---|---|
| Centralia_____ | 1969 | $134,800.00 |
| | 1970 | 106,108.32 |
| | 1971 | 160,623.59 |
| Evergreen _____ | 1969 | 95,900.00 |
| | 1970 | 92,350.00 |
| | 1971 | 84,450.00 |

Petitioners intended that the aggregate additions to the general ledger reserve accounts (federal insurance reserve and reserve for contingencies) would equal the estimated bad debt deduction allowable for additions to a reserve for losses on qualifying real property loans. Certain minor differences between such aggregate additions to these general ledger reserve accounts and the claimed bad debt deductions resulted from the more accurate determination of the allowable bad debt deduction made when the tax returns were prepared as compared to the computation made at the time of the prior posting to the general ledger accounts. These differences are reflected in the analysis of unappropriated retained earnings per books on Schedule M-2 of the tax returns of both petitioners.[2] However, no corresponding adjusting entries were ever made to any ledger reserve accounts.

The federal insurance reserve and the reserve for contingencies were restricted to absorbing losses on qualifying real property loans, and could not be used for any other purpose without the prior approval of the Federal Home Loan Bank Board. With such prior approval, however, these reserves could be used for other losses. In fact, no such use was ever made of these reserves. Dividends could not be paid from these accounts. The only entries made to those general ledger reserve accounts during the years in issue were additions to equal (and which approximately did equal) the bad debt deductions allowable under section 593 for additions to a reserve account for losses on qualifying real property loans.

---

[2] The Schedule M entries for the petitioners for the years in issue were as follows:

| Petitioner | Year | Schedule M entry |
|---|---|---|
| Centralia _____ | 1969 | $5,278 |
| | 1970 | (2,114) |
| | 1971 | 334 |
| Evergreen _____ | 1969 | 3,760 |
| | 1970 | (2,182) |
| | 1971 | 438 |

Qualifying real property loans are secured by mortgages on real property. When any of such loans go bad, the result is reflected as a profit or a loss on the sale of the foreclosed real property. Such profits and losses were recorded by petitioners on general ledger cards, and reflected on Schedule M-1 (reconciling book income to taxable income) of petitioners' tax returns. Such profits and losses were not added to or subtracted from the reserve accounts. During the years in issue, neither petitioner charged its federal insurance reserve or reserve for contingencies with any amounts, related to bad debts or otherwise.

Centralia and Evergreen maintained the following ledger cards prior to and during the years in issue:

| Petitioner | Name of ledger card | Date of last entry |
|---|---|---|
| Centralia | (a) Income reserve—nonqualifying loans | 12/31/62 |
| | (b) Income tax returns—qualifying loans | 12/31/65 |
| | (c) Income tax—supplementary | 12/31/64 |
| | (d) Income tax return—pre-1952 | 12/31/64 |
| Evergreen | (a) Reserve for losses—nonqualifying loans | 8/31/66 |
| | (b) Reserve for losses—qualifying loans | 12/29/67 |
| | (c) Reserve for losses—supplemental | 12/29/67 |
| | (d) Reserve for losses—pre-1952 | 8/31/66 |

Through 1967 (Evergreen) and 1965 (Centralia) petitioners annually credited their bad debt deductions to their qualifying loans reserves (ledger card (b) above).

After the last entry in petitioner Centralia's "Income tax return—qualifying loans" account and in petitioner Evergreen's "Reserve for losses—qualifying loans" account, petitioners adopted, and during the years in issue followed, the practice of adding amounts representing their estimates of their bad debt deductions annually to their federal insurance reserve and reserve for contingencies. Both such reserves had substantial balances when this practice was adopted.

During the years in issue, there was no occasion for any activity in the nonqualifying loan reserve or supplemental reserve for losses, and such reserves remained inactive.

Centralia experienced no bad debt losses for a 5-year period including the 3 years in issue. Centralia experienced no activity in any of the above reserve accounts from 1965 to 1972 except in the reserve for qualifying loans. Additions to a reserve for bad debts would have increased the reserve for qualifying loans had they been added to that account instead of to the reserve accounts

entitled "Federal Insurance Reserve" and "Reserve for Contingencies."

Evergreen experienced no activity in any of the above reserve accounts from 1967 to 1972 except in the reserve for qualifying loans. Additions to a reserve for bad debts would have increased the reserve for qualifying loans had they been added to that account instead of to the reserve accounts entitled "Federal Insurance Reserve" and "Reserve for Contingencies." Evergreen incurred certain bad debt losses during the years in issue, which were reflected on Schedule F (Form 1120) as an amount chargeable against the bad debt reserve. However, Evergreen did not make ledger entries charging any of its reserve accounts when there was such a bad debt, nor did it credit any such reserve when there was a recovery of a previous chargeoff. The record does not disclose whether any such recoveries were experienced.

## OPINION

Petitioners in these cases kept their bad debt reserve accounts in an unorthodox manner. While they appear to have gained thereby no discernible tax or other advantage, except possibly simplified bookkeeping, respondent contends that the accounting irregularities were fatal to petitioners' reserve method bad debt deductions under sections 166(c) and 593(b)(2). Petitioners contend that they were allowed to account as they did, and that if not, the error was harmless because it was readily possible to reconstruct the accounts as they should have been kept.

Under section 166(c) petitioners were entitled to use the reserve method of accounting for bad debts, and under that method to deduct "a reasonable addition to a reserve for bad debts." Because petitioners were concededly "domestic building and loan associations," the amount of their allowable additions to reserve for bad debts was governed by section 593(b). Under that section, such a taxpayer may (and petitioners did) choose to determine, and deduct, reasonable additions to their bad debt reserves, with the maximum allowable such addition being determined under the "percentage of taxable income method." This method permits a maximum deduction equal to a specified percentage of taxable income computed without regard to the deduction itself and with certain other modifications. For the taxable years in issue, the specified percentages were 60 percent in 1969, 57 percent in 1970, and 54 percent in 1971. The parties

agree that these maximum amounts were the amounts in fact deducted by petitioners, and no question was raised as to the correctness of their computations.

In order to use the "reserve method," petitioners were required to "establish and maintain" certain reserves. Section 593(c)(1) reads as follows:

(1) ESTABLISHMENT OF RESERVES.—Each taxpayer described in subsection (a) which uses the reserve method of accounting for bad debts shall establish and maintain a reserve for losses on qualifying real property loans, a reserve for losses on nonqualifying loans, and a supplemental reserve for losses on loans. For purposes of this title, such reserves shall be treated as reserves for bad debts, but no deduction shall be allowed for any addition to the supplemental reserve for losses on loans.

An amount deducted as an addition to the reserve for losses on qualifying real property loans is to be credited (added) to the reserve for losses on qualifying loans "by the close of the taxable year, or as soon as practicable thereafter." Sec. 1.593-5(b), Income Tax Regs. If a qualifying loan becomes worthless, it is to be charged to (subtracted from) the reserve for qualifying loans. Sec. 593(c)(6). Finally, upon liquidation of a taxpayer maintaining such a reserve, the balance of the reserve is includable in taxable income. *Citizens Federal Savings & Loan Assn. of Cleveland v. United States*, 290 F.2d. 932, 937 (Ct. Cl. 1961); *Arcadia Savings & Loan Association*, 34 T.C. 679 (1960), affd. 300 F.2d 247 (9th Cir. 1962); see *Citizens' Acceptance Corp. v. United States*, 462 F.2d 751 (3d Cir. 1972); *West Seattle National Bank of Seattle*, 33 T.C. 341 (1959), affd. 288 F.2d 47 (9th Cir. 1961); *Geyer, Cornell & Newell, Inc.*, 6 T.C. 96 (1946). But cf. *Nash v. United States*, 398 U.S. 1 (1970).

Both petitioners in fact duly established ledger cards representing the three statutory reserves. Neither petitioner held any nonqualifying loans during the years in issue, nor was there any occasion to add to the supplemental reserve for losses on loans during those years. The complained-of irregularities, therefore, concern only the reserve for losses on qualifying real property loans (qualifying loans reserve).

Through 1967 (Evergreen) and 1965 (Centralia) petitioners annually credited their bad debt deductions to their qualifying loans reserve, which Evergreen denominated "Reserve for Losses—Qualifying Loans" and Centralia denominated "Income Tax Returns—Qualifying Loans." The record fails to disclose

whether Evergreen or Centralia had any loan losses during this period to charge against those amounts, or if they did, whether they so charged them.

Starting with 1968 for Evergreen and 1966 for Centralia, a different accounting practice was adopted. The qualifying loans reserve ledger cards became inactive. Instead of crediting bad debt deductions to the qualifying loans reserve, they were credited to two other general ledger book accounts. These were labeled "Federal Insurance Reserve" and "Reserve for Contingencies." Both accounts had been previously used for other purposes and had substantial opening balances when this practice was adopted. The aggregate amounts so credited by each petitioner in each of the years in issue represented its best yearend estimate of the year's bad debt deduction. When the precise amount became known, Schedule M of each petitioner's corporate income tax return (Form 1120) contained a reconciling entry which represented the difference (or approximate difference) between the aggregate amount shown on the general ledger for the year in question as having been credited to the federal insurance reserve and the reserve for contingencies and the amount claimed as a bad debt deduction. The following table illustrates the reconcilation, for each year in issue, of the bad debt deduction claimed with the aggregate addition to the two reserves:

| Petitioner | Year | Added to reserve | Deduction claimed | Difference | Schedule M entry |
|---|---|---|---|---|---|
| Centralia_____ | 1969 | [1] $129,213.00 | $134,491.00 | $5,278.00 | $5,278 |
|  | 1970 | 106,108.32 | 103,994.46 | (2,113.86) | (2,114) |
|  | 1971 | 160,623.59 | 160,957.13 | 334.00 | 334 |
| Evergreen _____ | 1969 | 95,900.00 | 99,658.00 | 3,758.00 | 3,760 |
|  | 1970 | 92,350.00 | 90,167.81 | (2,182.19) | (2,182) |
|  | 1971 | 84,450.00 | 84,852.89 | 402.89 | 438 |

[1] $134,800 minus $5,587 prior year adjustment.

The $2 discrepancy for Evergreen for 1969 is explained as a rounding error. The record provides no explanation for either Evergreen's $35.11 discrepancy for 1971 or for Centralia's 14-cent discrepancy in 1970.

The federal insurance reserve was a sum determined as a function of the percentage of income in certain accounts and the volume of qualified loans. The reserve for contingencies simply represented the excess of the estimated bad debt deduction over the federal insurance reserve. Thus the sum of the two annual additions represented the estimated bad debt deduction. In effect,

for present purposes, the two accounts together were considered as a single reserve—the "Federal Insurance Reserve."

When petitioner Evergreen incurred bad debt losses during the years in issue, these were reflected on its Schedule F (Form 1120) as an amount chargeable against the bad debt reserve.[3] Centralia did not fill out the Schedule F on its returns for the years in issue. It had no bad debt losses during such years. During the years in issue, neither petitioner made ledger entries charging either the federal insurance reserve, the reserve for contingencies, or their inactive qualifying loans reserve when there was a bad debt, nor did they credit any such reserve when there was a recovery of a previous chargeoff. After their change in procedure, neither petitioner charged its federal insurance reserve or reserve for contingencies for any purposes extraneous to bad debts.

Both petitioners maintained their corporate tax returns as part of their corporate records. By reference to petitioners' records, including their tax returns, it was possible to reconstruct the qualifying loans reserves as they should have been maintained. However, no single ledger card or subsidiary account was maintained by means of which the correct balance in such account could be determined at a glance.

To recapitulate, the variances during the years in issue between petitioners' accounting methods and strict compliance with the regulations were as follows:

(1) The bad debt deduction was charged to two reserve accounts, both of which had been previously maintained for other purposes, so that determination of the portion thereof allegedly representing part of the "Reserve for Losses—Qualifying Loans" was impossible without reference to the balance in those accounts as of the time accounting methods were changed.

(2) Instead of being charged to a reserve account denominated "Reserve for Losses—Qualifying Loans," the annual credit was made, after the transition, to two different accounts, while the proper reserve was maintained as a dormant account holding a substantial balance. The amount which should have been held in the qualifying loans reserve was thereafter divided among three different accounts, two of which contained preexisting extraneous balances.

---

[3] For 1970, Evergreen deducted $90,167.81 but Schedule F showed an addition to reserve of $90,648.89. The $481.08 difference is unexplained.

(3) Instead of deducting bad debts from and adding back recoveries to the reserve accounts to which the bad debt deductions were credited, these items, in the case of Evergreen, were not reflected on any ledger cards or subordinate accounts. Centralia had no bad debts nor (so far as the record discloses) did either petitioner have any recoveries.

(4) Instead of crediting the reserve accounts with the precise bad debt deductions claimed, an estimated amount was used. No adjusting entries were made later when the correct amount became known. Hence reference to Schedule M of the tax return was also necessary to compute the intended reserve.

In order to reconstruct the intended balance in the qualifying loans reserves, reference would have been necessary to the following:

(1) The balance in the federal insurance reserve, the reserve for contingencies, and the reserve for losses—qualifying loans, as of the date accounting methods were changed.

(2) All subsequent additions to the federal insurance reserve and reserve for contingencies.

(3) All intervening bad debts charged off and recoveries obtained.

(4) All intervening Schedule M reconciliations, applied as adjustments to the credit to the reserve.

Such reconstruction would not have been impossible, but would involve considerable accounting effort. The auditing agent was unable readily to complete such a reconstruction, and respondent determined that the petitioners had strayed too far from the correct path.

That petitioners erred in their accounting treatment is indisputable. It is our task to determine whether the errors were fatal to the claimed bad debt deduction. The question is close, and the determination is not easy. We begin with a review of the prior authority.

Our leading decision, although it was decided under section 593 as it stood before amendments in 1963, is *Rio Grande Building & Loan Association,* 36 T.C. 657 (1961). In this reviewed decision, the taxpayer claimed bad debt reserve deductions equal to the then statutory maximum for its taxable years 1953 through 1955. No bad debt reserve was maintained, however, but instead various amounts were transferred to a "general loss reserve," a "legal reserve" and a "reserve for contingencies," and an amount

greater than the aggregate of such amounts was claimed as a deduction. The general loss reserve was set up in 1953 "as an addition to a bad debt reserve account." The legal reserve account was established "to provide a reserve against bad debts and loans." It had been established before 1953, at a time when domestic building and loan associations were exempt from Federal taxes. By the end of this exempt period, the legal reserve account held a balance of $110,000. After 1952, certain dividends had been paid out of the legal reserve account, but in amounts aggregating less than $110,000. The reserve for contingencies was established in 1955, but there was no evidence establishing that it was, in 1955, ever intended to be a reserve for bad debts. Respondent contended that only the amounts transferred to the "general loss reserve" were properly deductible. Petitioner defended the entire deduction it had claimed.

Three issues were presented for our decision. On the first issue, we held (without dissent), that to the extent the deductions claimed exceeded amounts timely transferred to *any* reserve, no deduction was available.

On the second issue, with Judge Murdock dissenting, we held that the bad debt deduction included the amounts added to the "legal reserve account," despite the fact that that account included an initial $110,000 which had never been deducted, and that dividends in a lesser amount had been paid out of the account, including payments during the years in issue. We stated that it was clear that the label attached to the account did not matter, and that there could be more than one bad debt reserve. *Rio Grande Building & Loan Association, supra* at 669. The holding inferentially establishes the further principle that the existence in an account of an initial balance which has an origin other than the bad debt reserve deduction is not fatal to the deduction of bad debt reserve amounts thereafter added, nor is the fact that amounts *not in excess of that original balance* may be or are charged against that reserve for reasons other than bad debts. Judge Murdock dissented on the ground that the dividend should be allocated to the most recent additions to the reserve, thereby disqualifying the reserve because it had been in fact used for purposes other than bad debts.

On the third issue, we held that no deduction was available for the amount placed in the reserve for contingencies, there being no

610

evidence it was intended to be a bad debt reserve.[4]

In *Levelland Savings & Loan Association v. United States,* 421 F.2d 243 (5th Cir. 1970), the taxpayer had transferred to an account designated "nonwithdrawable capital stock account" certain amounts, in addition to other amounts transferred to a bad debt reserve account. Three years (1961, 1962, and 1963) were involved, the latter being a year in which there was in effect the amended version of section 593, applicable to Evergreen and Centralia here. Respondent challenged the deductibility of the additions to the nonwithdrawable capital stock account, but allowed the deduction of the amounts transferred to the bad debt reserve account. The taxpayer contended, and had persuaded the District Court, that its transfers to the "nonwithdrawable capital stock account" were as efficacious as its transfers to its "bad debt reserve." The Court of Appeals, however, reversed as to all 3 years. It held as to 1961 and 1962 that a qualifying receptacle for the bad debt reserve deduction must meet the following requirements (421 F.2d at 246):

(1) It must be available for absorbing losses.

(2) It must be available for transfer to ordinary income when the need for the reserve ends.

(3) It must be earmarked and not used for any other purpose.

The "nonwithdrawable capital stock account" failed to meet these requirements. Under Texas law it was not available to absorb losses from bad debts as they occurred, but could be drawn upon only under very limited circumstances and with regulatory approval.

As to 1963, the court held that the amendments to section 593 did not liberalize the above substantive requirements. A qualifying reserve still had to be available for bad debts.

In *Colorado County Federal Savings & Loan Association,* 36 T.C. 1167 (1961), affd. 309 F.2d 751 (5th Cir. 1962), the tax-

---

[4] In a Memorandum Opinion of this Court on which respondent relies heavily, *United-American S & L Assn.,* 27 T.C.M. 421, 37 P-H Memo T.C. par. 68,091 (1968), Judge Murdock denied a bad debt deduction for 1963 to a domestic building and loan association which initially created a "contingent reserve account" (federal insurance reserve). The taxpayer in that case credited to that reserve an amount equal to its entire taxable income for 1963 *before* computation of its bad debt deduction. There was no showing, nor did the petitioner argue, for all that appears in the findings or opinion, that this "contingent reserve account" (federal insurance reserve) was intended to be a bad debt reserve meeting the requirements of sec. 593. But in August 1965, the taxpayer for the first time established a "reserve for losses on qualifying real property loans." The evidence showed no justification or excuse for such a long delay in establishing the reserve, and the deduction was disallowed.

payer failed to make any transfers to reserves on its books of account until 1½ or 2½ years after the close of the year. No issue was raised as to the qualifying character of the reserve accounts to which the transfers were ultimately made, but we held that the transfers came too late and failed to comply with the strictures of section 1.593-1 of the regulations that "the establishment of such reserve and all adjustments made thereto must be reflected on the regular books of account of the institution at the close of the taxable year or as soon as practicable thereafter."

To the same effect, under the amended section 593, was *Leesburg Federal Savings & Loan Association,* 55 T.C. 378 (1970). There the taxpayer never established reserve accounts, but relied on his tax returns alone to meet the bookkeeping requirements. There was no evidence that the returns had been made part of the taxpayer's accounting records, and we held on that ground that the bad debt deduction was not allowable. In addition, in the alternative, we pointed out that even if the returns had been part of the records, they did not meet the bookkeeping requirements of section 593 and the regulations thereunder. We stated that it was not enough that there be "a correct determination of the amount deducted in a given taxable year," for the statute also contemplates that "earmarking of these accounts also insures that they continue to be what they seem; bad debt reserves." *Leesburg Federal Savings & Loan Association, supra* at 387.

In *Commercial Savings & Loan Association,* 53 T.C. 14 (1969), the association in question (Allied) had general ledger accounts labeled "general reserve—legal" and "legal reserve—reserve for federal insurance." Both of these qualified as bad debt reserves for years before 1963. However, Allied continued to credit amounts thereto after 1963. Not until 23 and 11 months, respectively, after the close of its taxable years 1963 and 1964 did it establish the three reserves required for years after 1962. Allied had originally simply ignored the new statute and computed its bad debt deduction under the more generous provisions of the preexisting law. It never showed how much deduction it was entitled to under the new law. We denied the claimed deduction.

In *Newport Federal Savings & Loan Assn. v. United States,* 259 F. Supp. 82 (E.D. Ark. 1966), the taxpayer deferred crediting its bad debt deduction to its bad debt reserve for 1960 until on or

about June 30, 1961. The delay was held fatal, although the reserve itself was not found to be improper.

In *Security Federal Savings & Loan Association v. United States,* 346 F. Supp. 908 (M.D. Fla. 1972), the taxpayer credited bad debt deductions claimed for 1965, 1966, and 1967 to a "federal insurance reserve." This reserve included its bad debts reserve deductions as well as an additional amount carried to comply with the requirements of the Federal Home Loan Bank. The taxpayer maintained copies of its Federal income tax returns as part of its regular books of account, and included therewith schedules showing the three statutory loss reserve accounts. The court held that the additional amount maintained in the general ledger account "should not prejudice the taxpayer, since the amount allowed for income tax purposes was at all times within the reserve."

This Court finds persuasive the recent Revenue Ruling 71-333, I.R.B. 1971-30, 30 on which taxpayer places its reliance. The facts in Rev. Rul. 71-333 involved a similarly situated taxpayer that satisfied the record keeping requirements of Treas. Reg. § 1.593-7 by attaching to its income tax return a schedule showing the opening balance in each of the three loss reserves along with additions and charges to these accounts during the year. The taxpayer's schedule reflected the amounts in each of the three loss reserve accounts along with the total reserve at the end of the year. The aggregate amounts shown on this schedule with respect to the three specific reserve accounts were equal to the amounts for these items in the general ledger.

Rev. Rul. 71-333, which discusses Treas. Reg. § 1.593-7(A), states that a periodic reconciliation is required of the taxpayer if it elects to maintain a permanent subsidiary ledger containing an account for each of the subsidiary reserves. The taxpayer involved in Rev. Rul. 71-333, like this plaintiff, elected not to employ this method of accounting. Hence, there is only the requirement that the records be sufficiently complete and accurate to be reconcilable. See Rev. Rul. 68-420, C.B. 1968-2257.

Since the undisputed facts show that plaintiff did not maintain a permanent subsidiary ledger, the requirement of periodic reconciliation is inapplicable. Accordingly, under these circumstances, and since plaintiff did maintain sufficiently accurate income tax returns and schedules along with its permanent records, the record keeping requirement of Int. Rev. Code of 1954, § 593 is satisfied. [346 F.Supp. at 909-910.]

From the above cases, we note that taxpayers which have been denied their deductions fall into two classes. In one class are those which simply delay too long. It is clear that the book entries must be made promptly after the close of the year, generally by the

time returns are filed. *Colorado County, Commercial, Newport.*[5] In the other cases, either there was never a credit of the amount in question to a reserve account at all *(Leesburg; Rio Grande,* issue 1), there was no showing that the reserve account to which the credit was made was intended to be a bad debt reserve *(Rio Grande,* issue 3),[6] or the reserve account was not appropriately earmarked *(Levelland).* On the other hand, the label attached to the account is not material *(Rio Grande);* there may be a crediting to more than one reserve account within the overall total *(Rio Grande)* and an extraneous balance in the account is not fatal *(Rio Grande; Security Federal Savings).* The key question is not the name or the number, but the nature, of the reserve account(s) to which the credit is made. The statute contemplates that the reserve is to hold in suspense all unused bad debt deductions, for ultimate restoration to income in the event the reserve is no longer needed (e.g., on liquidation). If amounts claimed as bad debt deductions and placed in the reserve cannot be freely used to absorb bad debts, the reserve will fail to qualify *(Levelland).* However, payment of dividends out of such reserves up to but not in excess of the amount of an extraneous balance not representing such deductions is not itself fatal *(Rio Grande).*

Focusing on the facts of the present case, the issue is a narrow one. The *intent* to create and maintain a bad debt reserve was clearly present here (unlike *Rio Grande,* issue 3). No question of timeliness is presented; if what petitioners did passes muster for substance, it was not done too late. There is no question that all three statutory reserves were *established.* Since there were no credits or charges to be made to the reserve for losses— nonqualifying loans and reserve for losses—supplemental, the petitioners need not be charged with failure to maintain such reserves. And in a literal sense both petitioners "maintained" their reserve for losses—qualifying loans, albeit they diverted to another reserve, with preexisting balances, the amounts which should have been added to the reserve for losses—qualifying loans. However, under *Rio Grande,* the division of a reserve into two or three qualifying reserves is not fatal, nor is the opening extraneous balance. Nothing in the 1963 amendments seems to overturn these principles. If the petitioners' federal insurance

---

[5] Also *United-American.*

[6] Also *United-American.*

reserves (including their reserves for contingencies) had the same character and served the same function as a qualifying loans reserve, neither the bifurcation of the amount nor the irregular label placed on it would be disqualifying.

Before addressing the basic question of whether the federal insurance reserve had the proper character and function, we consider first the effect of the petitioners' failure to make book entries in their reserve accounts adjusting for the relatively minor variations between the original yearend estimates of the year's additions and the figure as finalized on the returns and reconciled by Schedule M. Even if the tax returns are said to be part of the books of the taxpayer, mere entries on the return do not suffice to render deductible amounts not credited to any reserve. *Rio Grande Building & Loan Association, supra; Leesburg Federal Saving & Loan Association, supra* (alternate holding). Thus petitioners may in no event deduct more than the lesser of (a) the statutory maximum (the amount actually deducted) or (b) the aggregate of the amounts actually credited to their federal insurance reserve and reserve for contingencies. Centralia may therefore deduct no more, in any event, than $129,213 in 1969 and $160,623.59 in 1971, and Evergreen may deduct no more than $95,900 in 1969 and $84,450 in 1971. In 1970, both petitioners claimed smaller deductions than the amount transferred to the reserve for that year, but nothing in the statute precludes making a larger book allowance for bad debts than the maximum statutory deduction, so this difference is not material for present purposes.

As a further preliminary question before addressing the main issue, we must consider the respondent's contention that petitioners' failure to charge bad debts and recoveries against their reserves is fatal to their bad debt reserve deductions. While petitioners had the privilege of reducing these reserves by the net amount of bad debts in excess of collections, their failure to exercise that privilege cannot adversely affect respondent. We need not decide what impact this failure would have, if any, upon the amount of income petitioners might be required to report when the time comes, as on liquidation, to restore any unused portions of these reserves to income. Had petitioner Evergreen properly credited its bad debts deduction to its qualifying loans reserve, we do not believe that mere failure to charge any bad debts against the reserve would have meant that such reserve was

not being "maintained." As to petitioner Centralia, moreover, there were no bad debt losses during the years at issue. While Evergreen apparently had a small amount of losses, we do not think that its failure to exercise its right to use such losses to reduce its reserve accounts should be fatal to its deduction. Respondent points to no case holding to the contrary.

Respondent, however, focuses principally on the nature of the federal insurance reserves. He does not contend that these reserves were available for dividends or that anything other than bad debt losses ever was in fact charged against them. However, he says there is no guarantee that a charge for losses other than from bad debts would not occur. He says that nomenclature aside, the federal insurance reserve is not properly *earmarked* if there can be any possibility of invasion other than by bad debt losses on qualifying loans. In fact it affirmatively appears that with the permission of the regulatory authority, it is possible for the federal insurance reserve to be invaded by losses other than bad debts, although no such invasion has in fact ever occurred. The central issue in this case then comes down to whether such possibility suffices to disqualify the federal insurance reserve as a component of petitioners' reserve for losses—qualifying loans.

Under the law prior to 1963, this issue seems to be resolved by *Rio Grande,* issue 2. We there held that a bad debt reserve was not tainted by *actual* invasion by extraneous withdrawals (dividends) as long as such invasions did not exceed the original extraneous reserve balance. A fortiori, the mere theoretical potential, rather than the actuality, of extraneous invasions, not by dividends but by other losses, would not have sufficed to disqualify an otherwise appropriate receptacle for bad debt losses. If *Rio Grande* is still good law, only *actual* extraneous invasion, not its mere potential, would disqualify the reserve. The question, therefore, is whether in amending section 593 Congress intended to remove this much latitude from the statute.

We do not think that the 1963 amendments had this effect. As we said in *Leesburg* (p. 387):

The legislative history similarly demonstrates that the status of the reserves must be maintained inviolate.[8] The deduction, then, is permitted only when the reserve is used for the sole purpose of absorbing bad debt losses. *Levelland Savings & Loan Association v. United States, supra; Rio Grande Building & Loan Association,* 36 T.C. at 663; *Colorado County Federal Savings & Loan Association,* 36 T.C. at 1171. The Commissioner is charged with allowing the

deduction for additions to bad debt reserves only where such reserves, in fact, exist. If the reserves have never been set up, or if once set up they are used for purposes which destroy their status as reserve accounts, then the deduction cannot be allowed.

[8] "[A]ny charge to any such reserve for an item other than a bad debt will result in the inclusion in gross income of an amount equal to such charge." H. Rept. No. 1447, 87th Cong., 2d Sess., pp. 34 and A44 (1962); S. Rept. No. 1881, 87th Cong., 2d Sess., p. 45 (1962).

The legislative history we cited there is most significant for our point. The committee report did not state that the theoretical *potential* of a charge to a reserve for an item other than a bad debt would render the reserve *ineligible as a qualifying reserve.* It said rather that where such a charge was *made,* income would result in the amount of the charge. In the teeth of such language, we cannot find it fatal that losses other than bad debts might have been charged to petitioners' reserves here, even though in fact they never were. In the case of each petitioner here, the estimated bad debt deduction was credited to the reserve after its accounting practice changed. The aggregate amounts so credited were equal to such estimates, and approximated the amounts deducted. The accounts were intended to constitute the statutory bad debts reserve as to the years in issue. They were not in practice used for extraneous purposes, and the only extraneous purpose for which such use was theoretically possible (losses other than bad debts) was at best a relatively remote eventuality. We hold that such eventuality was not itself fatal to the claimed deduction.

Having concluded that on the present facts the federal insurance reserve sufficiently met the statutory requirements to constitute a de facto reserve for losses on qualifying loans, we hold that petitioners were entitled to the bad debt deductions claimed up to but not in excess of such year's additions to that reserve (treating the reserve for contingencies as a part thereof).

*Decisions will be entered under Rule 155.*