**PERMANENT SAVINGS & LOAN ASSOCIATION, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. C–1–75–213.

United States District Court, S. D. Ohio, W. D.

Aug. 17, 1977.

Joseph A. Brant, Cincinnati, Ohio, for plaintiff.

Gerald F. Kaminski, Asst. U. S. Atty., Cincinnati, Ohio, for defendant. .

## MEMO DECISION

HOGAN, Chief Judge.

This case involves a claim by the plaintiff that it is entitled to compute deductions for additions to its bad debt reserve by the preferential method set forth in Section 593 of the Internal Revenue Code of 1954.

The plaintiff is a domestic building and loan association. Until 1952 such associations were exempt from federal income tax. In 1951 this complete exemption was repealed and building and loans were brought under and subject to the regular corporate income tax; however, they were allowed a special deduction for additions to bad debt reserves. This special deduction proved to be so large, however, that the change from exempt status was hardly felt and, for all practical purposes, the institutions retained exemption. This led to a tightening and narrowing of the bad debt provisions in the Revenue Act of 1962.

Section 166(c) of the 1954 Revenue Code provides:

"In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts."

Subsection (a) of Section 166 provides for a deduction for a bad debt which in fact becomes worthless within the taxable year. The section overally provides two methods under which a taxpayer may elect to take a bad debt deduction: one is based on debts which in fact become worthless, and the other is based merely on mechanical additions to reserve accounts. The reserve method of Section 166(c), as stated on its face, is taken instead of the method provided in subsection (a) and it allows the electing taxpayer to take a bad debt deduction in a certain year notwithstanding the fact that in that year the taxpayer incurred no bad debts. Consequently, the reserve method of deducting for bad debts is, by its very nature, founded upon fiction and not reality.

While Section 166(c) provides the general statutory authority for the deduction of additions to a bad debt reserve, Section 593 of the Internal Revenue Code prescribed both limitations on the amount of the deductions and also the rules of reserve

accounting which had to be adhered to by an electing building and loan in order to be entitled to a deduction for an addition to the reserve account. The Revenue Act of 1962 extensively revised Section 593 and provided for a more complex and strict method of making deductible additions to bad debt reserve accounts than was in use before 1963. The amended section which applies to the years in issue in this case specifically required the electing taxpayer to establish and maintain three specific reserve accounts. There is attached hereto an appendix which contains copies of the statutes and regulations involved in this case as they existed at the relevant times—1969 and 1970.

This is an income tax refund case involving calendar years 1969 and 1970 and generally two questions.

1) Whether plaintiff's failure to maintain on its permanent books and records the accounts required by Section 593(c) precluded the use of that section in determining its bad debt deductions; and

2) Whether the plaintiff failed to qualify as a "domestic building and loan association," within the meaning of Sections 593 and 7701(a)(19) during its 1970 taxable year.

### Findings of Fact

The plaintiff is an Ohio corporation for profit which did business in Ohio during 1969 and 1970 under the provisions of Ohio law applicable to building and loan associations. For those years plaintiff computed an addition to its reserve for bad debts pursuant to the percentage of income method set forth in Section 593. These computations resulted in plaintiff's claiming deductions in the amounts of $4,731.74 and $58,-899.92 for additions to its bad debt reserve for the years 1969 and 1970 respectively. At no time during those years, however, did plaintiff establish and maintain the three separate reserves required by Section 593(c). The amounts claimed as deductions were not added to any reserve.

During 1969 only $2,000.00 was credited to a bad debt reserve and the full amount claimed as a deduction for that year was not in fact credited on the plaintiff's permanent records until 1972.

Similarly, at no time during 1970 did plaintiff add the claimed deduction for that year to a reserve for bad debts. By the time the tax return for that year was filed, amounts totaling approximately $15,000.00 were so credited.

The amounts deducted for the alleged additions to the reserve but not in fact credited remained in plaintiff's undivided profits accounts or the retained earnings accounts and such amounts were available for the declaration of dividends.

In July, 1969 the plaintiff received a letter from the Arthur Young accounting firm, listing various reserves as of December 31, 1968 and indicating the level of the non-qualifying reserve, the qualifying reserve, and the supplemental reserve. The Arthur Young letter rendered advice on setting up the three reserves and the amounts involved. The advice was not actually followed and the reserves were not actually set up as suggested on the permanent books of the plaintiff. A schedule attached to the 1969 tax return reflected an addition to the qualifying reserve equivalent to the bad debt deduction. The plaintiff's accountants prepared the 1969 tax return using permanent books and accounts and also the Arthur Young letter. That letter was not maintained as part of the permanent books and accounts. In fact, it was not made available to the government examiner when he requested the pertinent records at the time the income tax examination was made. The accountant's computations were recorded on a series of reconciliation sheets or work papers which were used to prepare the 1969 return, and the reconciliation sheets reflected each of the reserve accounts set forth in the Arthur Young letter and reflected the addition of that year's bad debt deductions to the qualifying reserve. The reconciliation sheets were made available to the Internal Revenue Agent in the conduct of his examination in 1972; however, these reconciliation sheets had never been surrendered by the

accountant to the plaintiff and were not a part of the permanent records of the plaintiff. If the Arthur Young letter had been a part of the permanent records of the plaintiff and had been shown to the agent, he would not have raised the issue described as the first issue in this case with respect to either 1969 or 1970.

Similarly with respect to the 1970 tax return, an addition of $58,899.92 to the qualifying reserve was indicated on the return and that was the amount of the deductions taken. Copies of the 1969 and 1970 tax returns were maintained with the general ledger by the plaintiff; however, the balance in "qualified reserve" set forth on plaintiff's tax returns for the respective tax years could not be reconciled with the reserve account or any other control account in the plaintiff's general ledger, at least not without reference to other documents not a part of the plaintiff's books and records.

Neither the Arthur Young & Company letter, nor the work papers of the accountant prepared in connection with the income tax returns was kept and maintained as a permanent record of the bad debt reserves by the plaintiff.

The point of all the foregoing insofar as the first issue involved in this case is concerned is that while the reserves and deductions could have been ascertained and reconciled with respect to the two years involved by reference to instruments or combinations of instruments which were available, such as the Young letter and such as the tax returns in combination with other instruments, it is not controverted that not until 1972—subsequent to the years involved in this case—did the plaintiff meet the bookkeeping requirements provided for under Section 593(c) and the regulations thereunder. The requirements were: the establishment and maintenance, as a permanent part of the taxpayer's regular books of account, an account for each of the three reserves, i. e., qualifying, non-qualifying, and supplemental. There really is no dispute of fact that it was not until 1972 that the permanent books of the company showed the established reserves, etc.

The foregoing constitute the findings of fact on the first issue involved.

The findings on the second question or second issue are as follows:

During its 1970 tax year, plaintiff arranged with certain mortgage investment companies to make and close in its name loans actually negotiated and agreed upon between those mortgage loan companies and their customers. A rapid rise in interest rates occurred during that year and to survive the mortgage loan companies had to lend out their money at rates which violated the usury laws of Ohio. Plaintiff, however, was not subject to the same restrictions and could lend money at rates in excess of the rates at which the mortgage loan companies legally could. Under the arrangement between the plaintiff and a typical mortgage loan company, the mortgage company would negotiate a loan, a rate, the security, etc., with a particular customer. The mortgage company would then deposit funds in the amount of the loan and closing expense, etc., in plaintiff's bank in plaintiff's account. The loan company would further prepare all of the necessary papers and furnish the plaintiff with a closing "package." The plaintiff, for all practical purposes, had nothing more to do than write a disbursement check to the loan customer and execute the mortgage agreement in its name and then sign an assignment to the mortgage loan company and turn it all back to that company. The record is not one hundred percent clear on it, but the plaintiff was at no risk at all in the transaction. There is some claim that the assignment was with recourse, but none were produced and the fact finding in all the circumstances was that the plaintiff was at no risk of loss in the sense that it was doing nothing that would result in a "bad debt" loss to it. The assignment of the mortgage constituted the full satisfaction for the funds previously advanced. In exchange for its services and the use of its name in closing mortgages of the type described, plaintiff was paid a fee by the companies involved, amounting to a percentage of the amount of the loan. These

fees totaled almost $138,000.00 in the year 1970. The plaintiff's total gross income for the year was less than $236,000.00, or stated otherwise, more than half of its gross income resulted from fees for making nominee loans.

The loans involved were predominantly FHA–VA loans. The plaintiff claims that these loans were legal under Ohio law and we accept that. It is also clear that the records generally made by plaintiff at the time a loan of its own funds was made were also made in respect of these various nominee loans.

The plaintiff claims that loans were in fact made by it and "sold" to the mortgage loan company at a prearranged price. The evidence establishes, however, that the plaintiff was not acting as a principal in anything, but was acting as an agent and the monetary differential between what it received and paid out in each instance amounted to a fee for making a nominee loan.

The IRS disallowed plaintiff's claimed deductions under Section 593 for its failure to establish and maintain the records required during the periods involved. It also determined that plaintiff was not entitled to compute a deduction for 1970 under Section 593 since it failed to qualify as a "domestic building and loan association" as defined in Section 7701(a)(19) (see Appendix) during that year. As a result of these disallowances, plaintiff was assessed additional income taxes totaling $1,145.08 and $28,978.76 for its 1969 and 1970 taxable years.

Seasonably and prior to the filing of this case, plaintiff filed a timely administrative claim for refund which was subsequently disallowed. This action for tax refund was then filed, over which this Court has jurisdiction pursuant to 28 U.S.C. Section 1346(a)(1).

## Conclusions of Law

### Issue One

Section 593 provides for a special deduction for savings and loans which is not otherwise available to other taxpayers using the reserve method of accounting for bad debts. Such an institution may elect to deduct a percentage of taxable income as an addition to reserves for bad debts even though they have never experienced a bad debt and, on the basis of the experience method, would be entitled to no deduction whatever. The deduction is artificial and a much stronger case for requiring strict compliance with formal requirements can be and is made out vis-a-vis one in which the loss involved could be described as actual rather than fictional.

The accounting requirements involved were mandated by Congress in the statute. Congress required the establishment and maintenance of three accounts on the permanent books and records of the taxpayer. There is no question in this case that the plaintiff did not comply with the technical requirement.

The plaintiff's entire case rests on "substantial compliance" or "substance vs. form compliance." First, the plaintiff claims that the 1969 letter from Arthur Young is and was a part of its permanent records. It was an instrument possessed by the plaintiff, containing advice to the plaintiff to comply with the statute. Disregarded advice does not substitute for bookkeeping.

Secondly, the plaintiff claims that the work papers of their accountant made up in connection with the preparation of the tax returns constituted "permanent books and records." While those work papers may have been overally subject to the control of the plaintiff, they never came into the possession of the plaintiff. If they had been turned over to the plaintiff and kept with its ledger, we would have another question.

Thirdly, the claim is that the requirements were met in the so-called "Reserve Two," set forth in the calculation of a reduction in addition to its bad debt reserve on the tax return for each of the periods involved. Assuming this to be correct, no attempt was made in the tax return to show the existence of the other two required reserves—non-qualified and supplemental. In fact, no such reserves were ever created in the plaintiff's general ledger until about 1972.

■ The question of whether or not practically literal compliance with the requirements of Section 593 with respect to establishment of the three reserves and the maintenance of the establishment and changes thereto on the permanent records of the company is an absolute sine qua non of the optional deduction—that question has been involved in a number of cases and, uniformly, the conclusion has been that the reserves must be established and maintained and reconciled on the permanent books of the company in exactly the fashion prescribed by the statute as a basis for claiming the deduction. See *Pensacola v. United States,* 76–1 T.C. 9137 (N.D.Fla., 1975) and cases therein cited; *Leesburg v. Commissioner,* 55 T.C. 378 (1970); *Silverton v. United States,* 412 F.Supp. 17 (S.D.Ohio 1976). As the Court said in *Leesburg* —

"The bookkeeping requirements set out by the code and the regulation are intended to insure that the deduction is taken only for actual additions to genuine bad debt reserves."

■ Conclusorily, the plaintiff is not entitled to the deduction claim for 1969 and for 1970 for noncompliance with the bookkeeping requirements of § 593(c). The reserve accounts were not established or maintained as required by that section.

### Issue Two

■ Section 593 limits the deduction involved, insofar as this case is concerned, to "domestic building and loan associations." That term is specifically defined in Section 7701 and the definition provision requires that the business of a savings and loan must consist "principally of acquiring the savings of the public and investing in loans." The definition has been implemented by regulation or at least by a temporary regulation and that is numbered 402.1–2. The regulation defines the conditions under which the statutory definition will be considered as having been met. In the calculation certain items are included and certain are excluded. The regulation requires 75% of the gross income to consist of certain defined types and, furthermore, excludes certain income from inclusion in gross for purposes of the 75% computation. Whether one looks at the statute itself or the regulation, it is clear that the plaintiff in 1970 did not qualify as a domestic building and loan unless the income it realized from the mortgage loan customer transactions was income from "loans" or income from "sales of loans." From either point of view, the plaintiff does not qualify. The borrowers in the transactions involved actually did not borrow the plaintiff's money. The plaintiff was merely a conduit for the loan company customers. Nor did the plaintiff sell anything to those companies. It merely turned over what it had agreed to acquire nominally. The income derived from these transactions was not related to the sale of something, but a fixed fee for handling a given amount of money. While the plaintiff was a building association in 1970 for purposes of state law, and perhaps for many other purposes, it did not qualify for that year as a domestic building association for purposes of the special 593 deduction. A lending agent is not a building association either in the parlance or the statutory or regulatory definition.

The complaint should be dismissed and a judgment accordingly is being entered this date.

### APPENDIX

INTERNAL REVENUE CODE OF 1954 (26 U.S.C.):

SEC. 166. BAD DEBTS.

(a) *General Rule.*—

(1) *Wholly worthless debts.*—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

(2) *Partially worthless debts.*—When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.

\* \* \* \* \* \*

(c) *Reserve for Bad Debts.*—In lieu of any deduction under subsection (a), there

shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts.

SEC. 593 [as amended by P.L. 87–834, 76 Stat. 960]. RESERVES FOR LOSSES ON LOANS.

\* \* \* \* \* \*

(b) [1] *Addition to Reserves for Bad Debts.*—

(1) *In general.*—For purposes of section 166(c), the reasonable addition for the taxable year to the reserve for bad debts of any taxpayer described in subsection (a) shall be an amount equal to the sum of—

(A) the amount determined under section 166(c) to be a reasonable addition to the reserve for losses on non-qualifying loans, plus

(B) the amount determined by the taxpayer to be a reasonable addition to the reserve for losses on qualifying real property loans, but such amount shall not exceed the amount determined under paragraph (2), (3), or (4), whichever amount is the largest, but the amount determined under this subparagraph shall in no case be greater than the larger of—

(i) the amount determined under paragraph (4), or

(ii) the amount which, when added to the amount determined under subparagraph (A), equals the amount by which 12 percent of the total deposits or withdrawable accounts of depositors of the taxpayer at the close of such year exceeds the sum of its surplus, undivided profits, and reserves at the beginning of such year (taking into account any portion thereof attributable to the period before the first taxable year beginning after December 31, 1951).

(2) *Percentage of taxable income method.*—The amount determined under this paragraph for the taxable year shall be the excess of—

(A) an amount equal to 60 percent of the taxable income for such year, over

(B) the amount referred to in paragraph (1)(A) for such year, but the amount determined under this paragraph shall not exceed the amount necessary to increase the balance (as of the close of the taxable year) of the reserve for losses on qualifying real property loans to 6 percent of such loans outstanding at such time. For purposes of this paragraph, taxable income shall be computed—

(i) by excluding from gross income any amount included therein by reason of subsection (f), and (ii) without regard to any deduction allowable for any addition to the reserve for bad debts.

(3) *Percentage of real property loans method.*—The amount determined under this paragraph for the taxable year shall be an amount equal to the amount necessary to increase the balance (as of the close of the taxable year) of the reserve for losses on qualifying real property loans to an amount equal to—

(A) 3 percent of such loans outstanding at such time, plus

(B) in the case of a taxpayer which is a new company and which does not have capital stock with respect to which distributions of property (as defined in section 317(a)) are not allowable as a deduction under section 591, an amount equal to—

(i) 2 percent of so much of the amount of such loans outstanding at such time as does not exceed $4,000,000, reduced (but now below zero) by

(ii) the amount, if any, of the balance ·(as of the close of such taxable year) of the taxpayer's supplemental reserve for losses on loans.

For purposes of subparagraph (B), a taxpayer is a new company for any taxable

---

1. Various subsections also amended in ways not here relevant by P.L. 91–172, 83 Stat. 487, for taxable years beginning after July 11, 1969.

year only if such taxable year begins not more than 10 years after the first day on which it (or any predecessor) was authorized to do business as an organization described in subsection (a).

(4) *Experience method.*—The amount determined under this paragraph for the taxable year shall be an amount equal to the amount determined under section 166(c) (without regard to this subsection) to be a reasonable addition to the reserve for losses on qualifying real property loans.

\*      \*      \*      \*      \*   .   \*

(c) *Treatment of Reserves for Bad Debts.*—

(1) *Establishment of reserves.*—Each taxpayer described in subsection (a) which uses the reserve method of accounting for bad debts shall establish and maintain a reserve for losses on qualifying real property loans, a reserve for losses on nonqualifying loans, and a supplemental reserve for losses on loans. For purposes of this title, such reserves shall be treated as reserves for bad debts, but no deduction shall be allowed for any addition to the supplemental reserve for losses on loans.

(2) *Allocation of pre-1963 reserves.* —For purposes of this section, the pre-1963 reserves shall, as of the close of December 31, 1962, be allocated to, and constitute the opening balance of—

(A) the reserve for losses on nonqualifying loans,

(B) the reserve for losses on qualifying real property loans, and

(C) the supplemental reserve for losses on loans.

(3) *Method of allocation.*—The allocation provided by paragraph (2) shall be made—

(A) first, to the reserve described in paragraph (2)(A), to the extent such reserve is not increased above the amount which would be a reasonable addition under section 166(c) for a period in which the nonqualifying loans increased from zero to the amount thereof outstanding at the close of December 31, 1962;

(B) second, to the reserve described in paragraph (2)(B), to the extent such reserve is not increased above the amount which would be determined under paragraph (3)(A) or (4) of subsection (b) (whichever such amount is the larger) for a period in which the qualifying real property loans increased from zero to the amount thereof outstanding at the close of December 31, 1962; and

(C) then to the supplemental reserve for losses on loans.

(4) *Pre-1963 reserves defined.*—For purposes of this subsection, the term "pre-1963 reserves" means the net amount, determined as of the close of December 31, 1962 (after applying subsection (d)(1), accumulated in the reserve for bad debts pursuant to section 166(c) (or the corresponding provisions of prior revenue laws) for taxable years beginning after December 31, 1951.

\*      \*      \*      \*      \*      \*

(6) *Charging of bad debts to reserves.* —Any debt becoming worthless or partially worthless in respect of a qualifying real property loan shall be charged to the reserve for losses on such loans, and any debt becoming worthless or partially worthless in respect of a nonqualifying loan shall be charged to the reserve for losses on nonqualifying loans; except that any such debt, may at the election of the taxpayer, be charged in whole or in part to the supplemental reserve for losses on loans.

\*      \*      \*      \*      \*      \*

(e) *Loans Defined.*—For purposes of this section—

(1) *Qualifying real property loans.* —The term "qualifying real property loan" means any loan secured by an interest in improved real property or secured by an interest in real property which is to be improved out of the proceeds of the loan, but such term does not include—

\*      \*      \*      \*      \*      \*

(2) *Nonqualifying loans.*—The term "nonqualifying loan" means any loan which is not a qualifying real property loan.

(3) *Loan.*—The term "loan" means debt, as the term "debt" is used in section 166.

SEC. 7701 [as amended by P.L. 91–172, 83 Stat. 487]. Definitions.

\* \* \* \* \* \*

(19) *Domestic building and loan association.*—The term "domestic building and loan association" means a domestic building and loan association, a domestic savings and loan association, and a Federal savings and loan association.—

(A) which either (i) is an insured institution within the meaning of section 401(a) of the National Housing Act (12 U.S.C., sec. 1724(a)), or (ii) is subject by law to supervision over such associations;

(B) the business of which consists principally of acquiring the savings of the public and investing in loans; and

(C) at least 60 percent of the amount of the total assets of which (at the close of the taxable year) consists of—

\* \* \* \* \* \*

TEMPORARY REGULATIONS ON INCOME TAX (1954 Code) (26 C.F.R.):
§ 402.1–2. Post-1969 domestic building and loan association.

(a) *In general.* For taxable years beginning after July 11, 1969, the term "domestic building and loan association" means a domestic building and loan association, a domestic savings and loan association, a Federal savings and loan association, and any other savings institution chartered and supervised as a savings and loan or similar association under Federal or State law which meets the supervisory test (described in paragraph (b) of this section), the business operations test (described in paragraph (c) of this section), and the assets test (described in paragraph (d) of this section). For the definition of the term "domestic building and loan association" for taxable years begin-

ning after October 16, 1962, and before July 12, 1969, see § 301.7701–13.

(b) *Supervisory test.* A domestic building and loan association must be either (1) an insured institution within the meaning of section 401(a) of the National Housing Act (12 U.S.C. 1724(a)) or (2) subject by law to supervision and examination by State or Federal authority having supervision over such associations. An "insured institution" is one the accounts of which are insured by the Federal Savings and Loan Insurance Corporation.

(c) *Business operations test*—(1) *In general.* An association must utilize its assets so that its business consists principally of acquiring the savings of the public and investing in loans. The requirement of this paragraph is referred to in this section as the business operations test. The business of acquiring the savings of the public and investing in loans includes ancillary or incidental activities which are directly and primarily related to such acquisition and investment, such as advertising for savings, appraising property on which loans are to be made by the association, and inspecting the progress of construction in connection with construction loans. Even though an association meets the supervisory test described in paragraph (b) of this section and the assets test described in paragraph (d) of this section, it will nevertheless not qualify as a domestic building and loan association if it does not meet the requirements of both subparagraph (2) and (3) of this paragraph, relating, respectively, to acquiring the savings of the public and investing in loans.

\* \* \* \* \* \*

(3) *Investing in loans*—(i) *In general.* The requirements that an association's business (other than acquiring the savings of the public) must consist principally of investing in loans will be considered to be met for a taxable year only if more than 75 percent of the gross income of the association consists of—

(a) Interest or dividends on assets defined in subparagraphs (1), (2), and (3) of paragraph (e) of this section,

(b) Interest on loans,

(c) Income attributable to the portion of property used in the association's business, as defined in paragraph (e)(11) of this section,

(d) So much of the amount of premiums, discounts, commissions, or fees (including late charges and penalties) on loans which have at some time been held by the association, or for which firm commitments have been issued, as is not in excess of 20 percent of the gross income of the association,

(e) Net gain from sales and exchanges of governmental obligations, as defined in paragraph (e)(2) of this section, or

(f) Income, gain or loss attributable to foreclosed property, as defined in paragraph (e)(9) of this section, but not including such income, gain or loss which, pursuant to section 595 and the regulations thereunder, is not included in gross income.

Examples of types of income which would cause an association to fail to meet the requirements of this subparagraph if, in the aggregate, they equal or exceed 25 percent of gross income, are: the excess of gains over losses from sales of real property (other than foreclosed property); rental income (other than on foreclosed property and the portion of property used in the association's business); premiums, commissions, and fees (other than commitment fees) or loans which have never been held by the association; and insurance brokerage fees.

(ii) *Computation of gross income.* For purposes of this subparagraph, gross income is computed without regard to—

(a) Gain or loss on the sale or exchange of the portion of property used in the association's business as defined in paragraph (e)(11) of this section.

(b) Gain or loss on the sale or exchange of the rented portion of property used as the principal or branch office of the association, as defined in paragraph (e)(11) of this section, and

(c) Gains or losses on sales of participations and loans, other than governmental obligations defined in paragraph (e)(2) of this section.

For purposes of this subparagraph, gross income is also computed without regard to items which an association establishes arise out of transactions which are necessitated by exceptional circumstances and which are not undertaken as recurring business activities for profit. Thus, for example, an association would meet the investing in loans requirement if it can establish that it would otherwise fail to meet that requirement solely because of the receipt of a nonrecurring item of income due to exceptional circumstances. For this purpose, transactions necessitated by an excess of demand for loans over savings capital in the association's area are not to be deemed to be necessitated by exceptional circumstances. For purposes of (c) of this subdivision, the term "sales of participations" means sales by an association of interests in loans, which sales meet the requirements of the regulations of the Federal Home Loan Bank Board relating to sales of participants, or which meet substantially equivalent requirements of State law or regulations relating to sales of participations.

(iii) *Reporting requirement.* In the case of income tax returns for taxable years beginning after July 11, 1969, there is required to be filed with the return a statement showing the amount of gross income for the taxable year in each of the categories described in subdivision (i) of this subparagraph.