HOME SAVINGS & LOAN ASSOCIATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3083–80.    Filed March 23, 1983.

---

*Edwin J. Walker, Jr.*, and *Richard M. Hutson II*, for the petitioner.
*Eric B. Jorgensen*, for the respondent.

GOFFE, *Judge*: The Commissioner determined deficiencies in petitioner's Federal income tax for the taxable years and in the amounts as follows:

| Year | Deficiency | Year | Deficiency |
|------|-----------:|------|-----------:|
| 1969 .......... | $263.15 | 1973 .......... | $316,649.09 |
| 1970 .......... | 398.24 | 1974 .......... | 155,511.66 |
| 1971 .......... | 996.19 | 1975 .......... | 423,503.48 |
| 1972 .......... | 271,034.31 | 1976 .......... | 8,941.68 |

After concessions by the parties, the issues for decision are: (1) Whether the petitioner complied with the requirements of section 593, I.R.C. 1954, as amended, with respect to the reserve method of accounting for bad debts so as to be entitled to a bad debt deduction in the amount of $1,961,508 for its taxable year ending December 31, 1975; and (2) whether the petitioner is entitled to a deduction under section 162 or section 164 for the minimum tax for tax preference items imposed by section 56 for its taxable years ending December 31, 1973, and December 31, 1974, in the amounts of $35,065 and $21,611, respectively.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and stipulated exhibits are incorporated herein by this reference.

The petitioner is a corporation incorporated under the laws of the State of North Carolina and a federally chartered mutual savings and loan association without capital stock represented by shares. Its principal place of business was Durham, N.C., at the time its petition in this case was filed.

The petitioner filed its Federal corporate income tax return for the taxable year ending December 31, 1969, on the cash basis. Beginning with its taxable year ending December 31, 1970, the petitioner changed its method of accounting from the cash receipts and disbursements method to the accrual method. The petitioner filed its Federal corporate income tax returns for the taxable years 1970 through 1976 on the accrual basis.

The petitioner filed an amended Federal income tax return, compiled on the cash method of accounting, for the taxable year 1969.

The petitioner filed, on March 2, 1976, corporate applications for tentative refunds for the taxable years 1969 through 1974 in the amounts of $263.15 for 1969, $236.84 for 1970, $592.69 for 1971, $271,034.31 for 1972, $316,649.09 for 1973, and $73,305.16 for 1974. The amounts for 1972, 1973, and 1974 were refunded to petitioner on or about May 4, 1976. The amounts for 1969, 1970, and 1971 were refunded to petitioner on or about June 17, 1976. These refunds were created by the carryback of a net operating loss from 1975 to 1972 in the amount of $1,553,619.02, which created unused investment credits for 1972 which were carried back by the petitioner to 1969, 1970, and 1971. Of the $1,553,619.02, $913,066.95 and $167,798.21 were carried over to 1973 and 1974, respectively.

The petitioner filed amended Federal corporate income tax returns, compiled on the accrual method of accounting, for the taxable years 1973 and 1974 on March 16, 1977, and March 15, 1978, respectively. In these amended returns, the petitioner claimed deductions for its minimum tax for the tax preference items in the amount of $35,065 for 1973 and $21,611 for 1974.

The petitioner, as a federally chartered mutual savings and loan association, is under the jurisdiction of, and subject to, the regulations of the Federal Home Loan Bank.

The petitioner used the reserve method of accounting for bad debts for the taxable years 1969 through 1976. Under this reserve method, the petitioner computed its addition to the

reserve for bad debts using the percentage of taxable income method, under section 593(b)(2), for all of the taxable years except 1975. For the taxable year 1975, petitioner computed the addition to its reserve for bad debts using the experience[2] method under section 593(b)(4).

The petitioner's books and records included certain reserves. These reserves were established on permanent subsidiary ledger cards. For the taxable year 1975, the petitioner also retained a copy of both its 1975 tax return and a copy of its 1975 Allocation and Reconciliation of Reserves Schedule as part of its permanent books and records. The following accounts and subaccounts are among the above-mentioned reserves established and maintained by petitioner:

| *Account* | *Account No.* |
|---|---|
| Federal insurance reserves | 2731 |
| Reserves for losses on nonqualifying real property loans | 2726 |
| Reserves for losses on qualifying real property loans | 2727 |
| Supplemental reserves | 2728 |
| General loss reserves | 2732 |
| Special bad debt reserve | 2729 |
| Balance of general loss reserves | 2730 |
| Undivided profits | 2741 |

The three subaccounts of the Federal insurance reserve account comprise the three tax bad debt reserves required by section 593. The Federal insurance reserve account and most of the other mentioned accounts are required by the Federal Home Loan Bank.

At the petitioner's executive committee meeting on November 21, 1974, petitioner's directors approved the establishment of a valuation allowance reserve for possible loss on first mortgage loans and real estate owned (valuation reserve) in the amount of $1,250,000 for possible losses on three loans:

---

[2]Under sec. 593(b), taxpayers may determine their addition to reserves for bad debts under one of three methods: (1) Percentage of taxable income, (2) percentage of eligible loans, or (3) experience.

| Loan | Amount |
|------|--------|
| DR20023 Fletcher Woods | $600,000 |
| DR20482 Gregory Real Estate | 400,000 |
| DR20465 Heritage Hills | 250,000 |

Petitioner effected the action of its directors by making appropriate entries in its financial and bank regulatory books and records (a "book" entry as opposed to a tax entry)[3] to create this valuation reserve by transfers from general loss reserve accounts.

At petitioner's board of directors meeting on October 9, 1975, the directors approved an increase in the valuation reserve in the amount of $806,298. This amount reflects the total amount by which certain outstanding loans exceeded the appraised value of the collateral securing the loans. The loans and amounts were:

| Loan | Amount |
|------|--------|
| DR20189 Wakefield IV | $430,229 |
| DR20139 Wakefield I | 144,612 |
| DR20242 Chapel Towers II | 10,497 |
| DR20212 Penrith Associates | 220,960 |

Petitioner made appropriate book (as opposed to tax) entries to reflect this action.

At petitioner's board of directors meeting on November 13, 1975, the directors approved reducing the amount of the valuation reserve set aside for the Wakefield I loan (DR20139) from $144,612 to $51,612 and for the Wakefield IV loan (DR20189) from $430,229 to $132,730. At that time, the directors also approved an increase to the valuation reserve in the amount of $18,701 for the foreclosure of the Kavanau Real Estate Trust loan. The petitioner made appropriate book entries to reflect these actions.

At the petitioner's board of directors meeting on December 11, 1975, the directors approved an increase to the valuation reserve by $188,300 for the foreclosed Heritage Hills loan based on the appraised value of the collateral being less than

---

[3]Petitioner's books and records contain three types of accounts: (1) Financial, (2) those required by Federal Home Loan Bank regulations, and (3) those required for Federal tax purposes. For our purposes, it is only necessary to distinguish accounts maintained for tax purposes from other accounts.

the outstanding balance of the loan. The petitioner made appropriate book entries to reflect this action.

The Valuation Reserve account was increased on December 17, 1975, by the amount of $485,719.10 because the outstanding loan balance exceeded the appraised value of the underlying collateral for the foreclosed loans DR21244 and DR21396 to properties known as the Lee/Hall Properties. The petitioner made appropriate book entries to reflect this.

The Valuation Reserve account was decreased on December 30, 1975, in the amount of $390,282.75. This adjustment reduced the amounts in the valuation reserve for Fletcher Woods by the amount of $252,732.44, for Gregory Real Estate by the amount of $136,408.40, and for Wakefield IV by the amount of $1,141.93.

At petitioner's executive committee meeting on January 8, 1976, the directors approved the writedown of the following mortgage loans in the following amounts by crediting loan chargeoffs, account No. 999:

| Loan | Amount |
|---|---|
| DR20139 Wakefield I | $51,611.75 |
| DR20242 Chapel Towers II | 10,497.20 |
| DR20189 Wakefield IV | 131,588.07 |
| DR20023 Fletcher Woods | 347,267.56 |
| DR20482 Gregory Real Estate | 263,591.60 |

The directors also approved the writedown of the following loans in the following amounts to the real estate owned, account No. 1320:

| Loan | Amount |
|---|---|
| Heritage Hills | $438,300.00 |
| Kavanau Real Estate Trust | 18,700.30 |
| Penrith Associates | 220,960.77 |
| Lee/Hall Properties | 485,719.10 |

These amounts were debited to valuation reserve, thereby reducing that account by the total writeoff of $1,968,236.35. This amount constituted realized losses of the petitioner on its mortgage loans as reviewed and approved by the Federal Home Loan Bank Board, Atlanta, Ga. The chargeoffs in 1975

of $1,968,236.35 were in respect of "qualifying real property loans."[4]

Petitioner computed its bad debt deduction for 1975 under the experience method on Schedule 4 of its Federal income tax return for 1975, which appeared as follows:

*Computation of the experience method*
*bad debt deduction (I.R.C. sec. 585(b)(2)(B))*

|  | 12/31/74 | 12/31/75 |
|---|---|---|
| 1. *Qualifying real property loans* | | |
| First mortgage loans and REO | $110,128,994 | $107,776,651 |
| Less: | | |
| Loans in process | 4,232,426 | 2,354,753 |
| Loans secured by shares of stock | 693,700 | 364,200 |
| | 4,926,126 | 2,718,953 |
| Net loans | 105,202,868 | 105,057,698 |
| | | |
| 2. *Percentage of 1975 qualifying real property loans to 1974 (but not in excess of 100%)* | | 99.862% |
| | | |
| 3. *Permissible reserve for qualifying real property loans* | | |
| Reserve balance at 12/31/74 | | 4,875,647 |
| Percentage from part 2 (above) | | 99.862 |
| Permissible balance at 12/31/75 | | 4,868,919 |
| | | |
| 4. *Computation of the deduction* | | |
| Permissible balance at 12/31/75 (part 3) | | 4,868,919 |
| Reserve balance at 12/31/74 | 4,875,647 | |
| 1975 Bad debt chargeoffs (Schedule   )[5] | 1,968,236 | |
| Balance before the current addition | | 2,907,411 |
| 1975 experience method bad debt deduction | | 1,961,508 |

This schedule deals only with qualified real property loans and its computations are arithmetically correct.

The petitioner reflected on tax Schedule 10 of its Federal corporate income tax return for 1975 the following reserve balances as of January 1, 1975, and December 31, 1975. The

---

[4]The term "qualifying real property loans" is defined by sec. 593(d)(1) to mean, except for certain exceptions, any loan secured by an interest in improved real property or secured by an interest in real property which is to be improved out of the proceeds of the loan.

[5]This schedule number was left blank. The detail of these chargeoffs was included in "Detail of Loan Losses Supporting Schedule 4" which followed Schedule 4 as part of its 1975 Federal income tax return.

first three of these constitute the required tax bad debt reserves.

|  | 1/1/75 | 12/31/75 |
|---|---|---|
| I Nonqualifying reserves | $1,000.00 | $1,000.00 |
| II Qualifying real property loans | 4,875,647.15 | 4,868,919.00 |
| III Supplemental reserves | 1,465,774.35 | 872,749.48 |
| IV Pre-1952 reserves | 724,265.26 | 74,265.26 |
| V Tax paid or exempt | 1,677,932.71 | 1,987,489.33 |
|  | 8,744,619.47 | 7,804,423.07 |

The net adjustment to petitioner's Reserves for Losses on Qualifying Real Property Loans as a result of its calculations on Schedule 4 was $6,728.15. This is the result of reducing the account by the $1,968,236 bad debt chargeoff and then increasing the account by the 1975 experience method bad debt deduction to restore the account to the permissible balance of $4,868,919. Petitioner's Reserve for Losses on Qualifying Real Property Loans account (No. 2727) as maintained by ledger card showed a balance of $4,875,647.15 after the posting of the 1974 adjustment. The 1975 adjustment, posted on March 2, 1976, was a reduction to the account in the amount of $6,728.15, creating a balance of $4,868,919.

The petitioner's Allocation and Reconciliation of Reserves Schedule for 1975 shows a beginning balance of $4,875,647.15 for Reserves for Qualifying Real Property Loans, an adjustment for the year reducing the account by $6,728.15, and an ending balance of $4,868,919.

The petitioner, on its Federal corporate income tax return for its taxable year ended December 31, 1975, claimed a bad debt deduction in the amount of $1,961,508, which was disallowed by the Commissioner in his notice of deficiency dated December 10, 1979.

The Commissioner, in his notice of deficiency, disallowed petitioner's 1975 bad debt deduction as follows:

(e) It is determined that for the tax year 1975 no deduction—using the experience method—it [sic] is allowable for bad debt expense, because the requirements of Internal Revenue Code section 593 have not been met. Specifically, (1) the chargeoff of the bad debt losses was not made to the Reserve for Qualifying Real Property Loans; (2) the addition to the reserve in respect to losses on qualifying real property loans was not made to the Reserve for Qualifying Real Property Loans; and (3) the books and records contain no entry recording the bad debt expense and/or the addition to bad

debt reserve account. Accordingly, taxable income for 1975 is increased $1,961,508.

The Commissioner also indicated, in his notice of deficiency, that the claims for refund would be disallowed if the minimum tax issues raised in the petitioner's claims for refund were not made a part of a petition to be considered by this Court in any determination of the petitioner's tax liability.

## OPINION

Petitioner computed, recorded, and claimed a deduction for bad debts in 1975 in the amount of $1,961,508. The Commissioner determined that petitioner was not entitled to this deduction because it did not comply with the requirements of section 593.

Section 166(a) allows a deduction for any debt that becomes worthless in the taxable year. Section 166(c) provides that in lieu of a section 166(a) deduction, a deduction will be allowed for reasonable addition to a reserve for bad debts. Section 166(g)(3) provides that section 593 sets forth special rules for bad debt reserves of certain organizations, such as petitioner, a mutual savings and loan association not having capital stock represented by shares.

Section 593(b) permits a mutual savings and loan association using the reserve method to claim a deduction for an addition to its reserve for bad debts equal to the largest of the amounts computed using the following three methods: (1) The percentage of taxable income; (2) the percentage of eligible loans; or (3) experience. The experience method, used by petitioner in the year at issue, is authorized by section 593(b)(4) and, by reference to section 585(b)(3), generally permits a bad debt deduction sufficient to restore the reserve balance (in this case, the Reserve for Losses on Qualifying Real Property Loans) to the amount which bears the same ratio to loans outstanding at the close of the taxable year as the balance of the reserves at the close of the "base year" bears to the amount of loans outstanding at the close of the base year. The base year is defined as the last taxable year before the most recent adoptions of the experience method, which, for petitioner, is 1974. The savings and loan association also must maintain the reserve for bad debts in accordance with section 593(c) and sections 1.593–5 and 1.593–7, Income Tax Regs.

With regard to the establishment and maintenance of reserves for bad debts by a savings and loan association, section 593(c)(1) provides:

Each taxpayer described in subsection (a) which uses the reserve method of accounting for bad debts shall establish and maintain a reserve for losses on qualifying real property loans, a reserve for losses on nonqualifying loans, and a supplemental reserve for losses on loans. For purposes of this title, such reserves shall be treated as reserves for bad debts, but no deduction shall be allowed for any addition to the supplemental reserve for losses on loans.

Section 593(c)(6), as in effect for the year at issue, provided for the charging of bad debt losses to reserves:

Any debt becoming worthless or partially worthless in respect of a qualifying real property loan shall be charged to the reserve for losses on such loans, and any debt becoming worthless or partially worthless in respect of a nonqualifying loan shall be charged to the reserve for losses on nonqualifying loans; except that any such debt may, at the election of the taxpayer, be charged in whole or in part to the supplemental reserve for losses on loans.

### Section 1.593–5(b)(1), Income Tax Regs., provides:

(b) *Crediting to reserves required* —(1) *In general.* The amounts referred to in paragraph (a)(1) and (2) of this section [the section 166(a) or 166(c) deduction for bad debts] must be credited, respectively, to the reserve for losses on nonqualifying loans and to the reserve for losses on qualifying real property loans by the close of the taxable year, or as soon as practicable thereafter. For rules with respect to accounting for such reserves, see paragraph (a)(2) of section 1.593–7.

Section 1.593–7, Income Tax Regs., sets forth the rules for the establishment and treatment or accounting for the reserves for bad debts. Section 1.593–7(a), Income Tax Regs., provides in relevant part:

(a) *Establishment of reserves*—(1) *In general.* A taxpayer described in section 1.593–4 shall establish and maintain a reserve for losses on nonqualifying loans, a reserve for losses on qualifying real property loans, and, if required under paragraph (b)(4) or (c)(3)(i)(c) of this section, a supplemental reserve for losses on loans. For rules governing the crediting of additions to the reserve for losses on nonqualifying loans and the reserve for losses on qualifying real property loans, see paragraph (b) of section 1.593–5.

(2) *Accounting for reserves.* (i) The taxpayer shall establish and maintain as a permanent part of its regular books of account an account for each of the reserves established pursuant to subparagraph (1) of this paragraph. For purposes of the preceding sentence, a taxpayer may establish and maintain a permanent subsidiary ledger containing an account for each of such reserves. If a taxpayer maintains such a permanent subsidiary ledger, the

total of the reserve accounts in such ledger, and the total of the reserve accounts in any other ledger, must be reconciled.

(ii) Any credit or charge to a reserve established pursuant to subparagraph (1) of this paragraph must be made to such reserve irrespective of whether the amount thereof is also credited or charged to any surplus, reserve, or other account which the taxpayer may be required or permitted to maintain pursuant to any Federal or State statute, regulation, or supervisory order.

The treatment of the reserves for bad debts is also set forth in section 1.593–7(c), Income Tax Regs., which provides in relevant part that:

(c) *Treatment of reserves*—(1) *In general.* Except as provided in paragraph (d) of section 1.593–8 (relating to the allocation of pre-1952 surplus), each of the reserves established pursuant to paragraph (a) of this section shall be treated, for purposes of subtitle A of the Code, as a reserve for bad debts, except that no deduction shall be allowed under section 166 for any addition to the supplemental reserve for losses on loans. Accordingly, if in any taxable year the taxpayer charges any of the reserves established pursuant to paragraph (a) of this section for an item other than a bad debt, gross income for such year shall be increased by the amount of such charge.

\* \* \* \* \* \* \*

(2) *Bad debt losses.* Any bad debt in respect of a nonqualifying loan shall be charged against the reserve for losses on nonqualifying loans, and any bad debt in respect of a qualifying real property loan shall be charged against the reserve for losses on qualifying real property loans. At the option of the taxpayer, however, any bad debt in respect of either class of loans may be charged in whole or in part against the supplemental reserve for losses on loans.

The question before us is not whether petitioner incurred bad debt losses during 1975, it is agreed that it did, but rather whether petitioner complied with the statutes and regulations, set forth above, permitting petitioner a deduction on the basis and method the petitioner used.

Respondent's view of petitioner's lack of compliance is based on two things. First, respondent argues that petitioner did not keep its 1975 tax return and the 1975 reserve Allocation and Reconciliation of Reserves Schedule (the disputed documents) as part of petitioner's permanent books and records. Second, respondent maintains that section 593 and the regulations require strict recordkeeping with which petitioner has not complied.

Respondent is wrong with respect to the records that petitioner kept. It is undisputed that petitioner retained these

records. Respondent maintains, however, that they were not maintained as part of petitioner's books and records because they were kept in a locked box accessible only to certain corporate officers. Linda Carden, an officer of petitioner who was treasurer of petitioner from 1975 through 1978, testified that petitioner retained these documents as part of its books and records. She further testified that she went to the locked box "quite often" to get these documents for examinations or for auditors. This testimony is uncontroverted and we believe her. We have found that petitioner retained these documents as part of its books and records. We turn now to the recordkeeping requirements of section 593.

Section 593 and the relevant regulations require that a taxpayer wishing to use the reserve method of accounting for bad debts establish three accounts:

(1) A reserve for losses on qualifying real property loans,
(2) A reserve for losses on nonqualifying loans, and
(3) A supplemental reserve for losses on loans. Sec. 593(c)(1).

Taxpayers must establish and maintain these reserves as a permanent part of their books and records. Sec. 1.593–7(a)(2), Income Tax Regs. Bad debts arising from qualifying or nonqualifying loans must be charged to losses on the appropriate accounts, or to the supplemental reserve. Sec. 593(c)(6). Additions to bad debts must be credited to the appropriate reserve account by the close of the taxable year or as soon as practicable thereafter. Sec. 1.593–5(b)(1), Income Tax Regs. A taxpayer may establish and maintain a permanent subsidiary ledger containing these accounts, but it must reconcile the total in such ledger to any other ledger. Sec. 1.593–7(a)(2)(i), Income Tax Regs. It must also make a credit or charge to the appropriate account, notwithstanding whether the amount is credited or charged to another account. Sec. 1.593–7(a)(2)(ii), Income Tax Regs. Finally, taxpayers receive deductions only for losses to the qualifying and nonqualifying reserves, and taxable income will be increased to the extent that a taxpayer charges an item other than a bad debt to these reserves. Sec. 1.593–7(c)(1); Income Tax Regs.

When we consider the disputed documents as part of petitioner's books and records, it is clear that petitioner met the recordkeeping requirements of section 593 and the rele-

vant regulations. Schedule 4 of petitioner's Federal income tax return for 1975 shows the computation of petitioner's bad debt deduction using the experience method. This schedule computes and identifies not only the bad debt chargeoff for the year but also the correct addition to the reserve for bad debts permitted by law. Petitioner's Allocation and Reconciliation of Reserves for 1975 (the Reconciliation) sets forth the financial and bank regulatory accounts on its horizontal axis and the tax accounts together with other balancing accounts in its vertical axis. For the tax account "Qualifying real property loans," which is one of the tax reserves that petitioner was required to maintain and is the tax account relevant to this issue, the Reconciliation showed an opening balance at January 1, 1975, in the amount of $4,875,647.15. It then showed an adjustment for 1975 in the amount of ($6,728.15) to arrive at a closing balance on December 31, 1975, in the amount of $4,868,919. Petitioner's permanent ledger card No. 2727, "Federal Insurance Reserve—Reserve for Losses on Qualifying Real Property Loans," showed a balance of $4,875,647.15 after the posting of the 1974 adjustment. The 1975 adjustment, posted on March 2, 1976, was a reduction to the account in the amount of $6,728.15, creating a balance of $4,868,919. The ($6,728.15) entry is but the net of the $1,968,236 reduction in the reserve account as a result of the 1975 bad debt chargeoff and the $1,961,508 increase in the reserve account to bring the reserve account back up to the permissible level.

The above clearly demonstrates that petitioner maintained the required tax reserves, posted both the bad debt writeoff and the increase in the reserve to the appropriate account, albeit by a net entry, and reconciled its tax accounts to its other accounts.

Respondent maintains, however, that section 593 and the regulations require strict recordkeeping that petitioner has not complied with. Respondent cites language in the cases to the effect that reserve accounting for bad debt losses and deductions for additions to bad debt reserves are regarded as tax "privileges" for which strict compliance with the statute is necessary. *Leesburg Federal Savings & Loan Association v. Commissioner*, 55 T.C. 378, 384–385 (1970); *Commercial Savings & Loan Association v. Commissioner*, 53 T.C. 14, 20–21 (1969); *Rio Grande Building & Loan Association v. Commis-*

*sioner*, 36 T.C. 657, 663 (1961). The recordkeeping regulations are intended "to insure that the deduction is taken only for actual additions to *genuine* bad debt reserves." The regulations are also intended to insure a correct determination of the amount deducted in a given taxable year, "Earmarking of these accounts also insures that they continue to be what they seem: bad debt reserves."[6] *Leesburg Federal Savings & Loan Association v. Commissioner, supra* at 386–387.

We recently reviewed the case law in this area in *Centralia Federal Savings & Loan Association v. Commissioner*, 66 T.C. 599, 608–613 (1976), affd. 586 F.2d 723 (9th Cir. 1978). We then presented this summary at pages 612–613:

> From the above cases, we note that taxpayers which have been denied their deductions fall into two classes. In one class are those which simply delay too long. It is clear that the book entries must be made promptly after the close of the year, generally by the time returns are filed. *Colorado County, Commerical, Newport*. In the other cases, either there was never a credit of the amount in question to a reserve account at all (*Leesburg; Rio Grande*, issue 1), there was no showing that the reserve account to which the credit was made was intended to be a bad debt reserve (*Rio Grande*, issue 3), or the reserve account was not appropriately earmarked (*Levelland*). On the other hand, the label attached to the account is not material (*Rio Grande*); there may be a crediting to more than one reserve account within the overall total (*Rio Grande*) and an extraneous balance in the account is not fatal (*Rio Grande; Security Federal Savings*). The key question is not the name or the number, but the nature, of the reserve account(s) to which the credit is made. The statute contemplates that the reserve is to hold in suspense all unused bad debt deductions, for ultimate restoration to income in the event the reserve is no longer needed (e.g., on liquidation). If amounts claimed as bad debt deductions and placed in the reserve cannot be freely used to absorb bad debts, the reserve will fail to qualify (*Levelland*). However, payment of dividends out of such reserves up to but not in excess of the amount of an extraneous balance not representing such deductions is not itself fatal (*Rio Grande*). [Fn. refs. omitted. We did not give full citations in this paragraph because these citations were set forth in our previous discussion. These citations are as follows: *Levelland Savings & Loan Association v. United States*, 421 F.2d 243 (5th Cir. 1970); *Leesburg Federal Savings & Loan*

---

[6]Petitioner maintains that the cases calling for strict compliance of the recordkeeping requirements do not involve the experience method of providing for the increase in the reserve for bad debts. It distinguishes these cases as providing for strict compliance where the calculation of the deduction is fictional, as in the percentage of income method. Petitioner argues that this case is different in that it is claiming a deduction for actual losses, relying on language in *Permanent Savings & Loan Association v. United States*, 439 F.Supp. 917 (S.D. Ohio 1977). We do not find it necessary to decide the extent of this distinction in this case.

*Association v. Commissioner,* 55 T.C. 378 (1970); *Commercial Savings & Loan Association v. Commissioner,* 53 T.C. 14 (1969); *Colorado County Federal Savings & Loan Association v. Commissioner,* 36 T.C. 1167 (1961), affd. 309 F.2d 751 (5th Cir. 1962); *Rio Grande Building & Loan Association v. Commissioner,* 36 T.C. 657 (1961); *Security Federal Savings & Loan Association v. United States,* 346 F. Supp. 908 (M.D. Fla. 1972); *Newport Federal Savings & Loan Association v. United States,* 259 F. Supp. 82 (E.D. Ark. 1966).]

In *Centralia,* the taxpayers, both savings and loan associations, elected the reserve method for bad debts and computed their annual additions to reserves under the percentage of taxable income method. Instead of crediting such additions to their "reserve for losses on qualifying real property loans," however, taxpayers, during the years in issue, credited such additions to different reserve accounts denominated "Federal Insurance Reserve" and "Reserve for Contingencies." These two accounts were considered as constituting together a single reserve account—the Federal insurance reserve—and were intended to serve as the statutory bad debt reserve on qualifying loans.

The credits to these accounts took the form of yearend approximations of the year's bad debt deductions, but no adjusting entries were made on the book accounts when the precise amount of available deductions became known at the time the returns were filed. Instead, reconciling entries were made on Schedule M of their Federal corporate income tax returns. Taxpayer Evergreen never charged its reserve accounts for bad debts. Taxpayer Centralia had no bad debts or recoveries in the years in issue. Under section 593, the taxpayers should have credited their bad debt deductions to the "reserve for losses on qualifying real property loans."

On these facts we found that the Federal insurance reserve served as a reserve for losses on qualifying real property loans and that the taxpayers were entitled to deductions for the amounts credited to the reserve accounts to the extent that they did not exceed the maximum deduction otherwise available on the percentage of taxable income method. We also found that reconciling entries on Schedule M do not substitute for book adjustment entries. In affirming this opinion, the Ninth Circuit described this as a practical, commonsense approach. *Centralia Federal Savings & Loan Association v. Commissioner,* 586 F.2d 723, 724 (9th Cir. 1978).

With this background, we will consider respondent's specific arguments. Respondent maintains that petitioner did not comply with the recordkeeping requirement of section 593 and the regulations as follows: Respondent argues that petitioner charged off its bad debt losses against accounts other than its Reserve for Losses on Qualified Real Property Loans. Respondent further argues that petitioner also failed to make an addition to its Reserve for Losses on Qualifying Real Property Loans in the amount of its bad debt deduction in order to restore the balance in that reserve as of December 31, 1975, to an amount determined pursuant to section 593(b)(4). Finally, respondent maintains that petitioner's accounting books and records contain no entries recording the bad debt expense and the addition to bad debt reserve as required by section 166, section 593(c), and the relevant regulations.

Respondent's first argument is that the petitioner charged off its bad debt losses with respect to qualifying real property loans in the amount of $1,968,236.35 to its Valuation Allowance Reserve for Possible Losses on First Mortgage Loans and Real Estate Owned, account No. 2512, and through that account to its Supplemental Reserve, account No. 2729, in the amount of $650,000, its Pre-1952 Reserves, account No. 2730, in the amount of $600,000, and its Tax Paid or Exempt-Undivided Profits, account No. 2742, in the amount of $718,236.35. Respondent maintains that under the provisions of section 593(c)(3) and section 1.593–7(c)(2), Income Tax Regs., bad debt losses stemming from petitioner's writedown of real estate owned and mortgages should have been charged off to its Reserve for Losses on Qualifying Real Property Loans, account No. 2727.

We have previously found that petitioner did charge off its 1975 bad debt losses to account No. 2727. Respondent's reluctance to accept this stems both from his failure to accept the disputed documents as a part of petitioner's books and records and from confusing petitioner's book entries from its tax entries. The entries that respondent refers to do not constitute petitioner's writedown of its 1975 bad debt losses. The $650,000 and $600,000 entries were made in 1974 and consisted of shifting loss reserves from one account to another. None of these entries were tax entries.

Respondent's second argument is that the petitioner's accounting books and records contained no entry recording the

bad debt expense and the corresponding addition to the bad debt reserve account, Reserve for Losses on Qualifying Real Property Losses, account No. 2727. Respondent maintains that the addition to replenish the Reserve for Losses on Qualifying Real Property Loans, account No. 2727, was not in fact made to the Reserve for Losses on Qualifying Real Property Loans at the end of the taxable year 1975, nor as soon thereafter as possible, as required by sections 1.593–5(b) and 1.593–7(a)(2)(ii), Income Tax Regs.

This argument rests primarily on respondent's refusal to consider the disputed documents as a part of petitioner's books and records, a position we have rejected. In addition, respondent maintains that petitioner did not make a "net" entry to account No. 2727 to both write off the bad debt losses for 1975 and to increase the reserve account to the permissible level. Respondent argues that petitioner really made its entries to other accounts and that this net entry which on its face appears to comply with the recordkeeping requirements is a "plugged figure."[7]

Respondent's third argument, that petitioner's books and records contain no entries recording the bad debt expense and the addition to the bad debt reserve to the Reserve for Losses on Qualified Real Property Loans, is grounded on essentially the same basis as the previous argument.

Though unconvinced, we will for the moment accept respondent's contention that petitioner made its entries to book accounts and that it in so doing was somehow forced to make a plug figure adjustment to the proper tax account. Accepting this, we do not see how petitioner has failed to comply with section 593 and the regulations. Petitioner maintained the proper reserve accounts as a permanent part of its books and records. Schedule 4 of petitioner's tax return, retained as a permanent part of petitioner's books and records, shows the proper amounts to be charged to the proper accounts. The proper reserve account, albeit in a roundabout way, is adjusted in exactly the same amount as if it were done directly. The petitioner maintains, again as a permanent part of its books

---

[7] A plugged figure is one that is artificially determined. Generally, this is the amount necessary to make something balance.

and records, a schedule reconciling its book accounts to its tax accounts. These entries are made concurrent with, or before the filing of, petitioner's Federal income tax return and thus are timely. Consistent with our analysis of these requirements in *Centralia Federal Savings & Loan Association v. Commissioner*, 66 T.C. 599 (1976), affd. 586 F.2d 723 (9th Cir. 1978), we find that petitioner has complied with these requirements and is entitled to its claimed deduction.

The second issue for our decision is whether petitioner may claim payments for the minimum tax for tax preference items as deductions against its income tax liability. Petitioner argues that the minimum tax imposed by section 56 is in the nature of an excise, duty, surcharge, or privilege tax, so that such payments are deductible. We have previously found that the minimum tax is a nondeductible Federal income tax and, as such it is not deductible here. *Standard Oil Co. (Indiana) v. Commissioner*, 77 T.C. 349 (1981). See also *Wyly v. United States*, 662 F.2d 397 (5th Cir. 1981); *Graff v. Commissioner*, 74 T.C. 743 (1980), affd. on other issues 673 F.2d 784 (5th Cir. 1982).

To give effect to the foregoing and other concessions by the parties,

*Decision will be entered under Rule 155.*